J-A26031-18

2019 PA Super 16

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CHARLES F. NEVELS, III | : | |
| | : | |
| Appellant | : | No. 1354 WDA 2017 |

Appeal from the Judgment of Sentence August 25, 2017
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0011118-2015

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MURRAY, J.

OPINION BY MURRAY, J.:                    FILED JANUARY 18, 2019

Charles F. Nevels, III (Appellant) appeals from the judgment of sentence imposed after a jury found him guilty of 23 crimes, including three counts of attempted homicide,[1] two counts of retaliation against a witness,[2] and three counts of aggravated arson.[3]  After careful review, we affirm.

The trial court summarized the underlying facts as follows:

Tara Jones and her husband, Darwin Jones (hereinafter "Mr. and Mrs. Jones"), witnessed the commission of a homicide outside their residence.  Mr. and Mrs. Jones cooperated with police and the Commonwealth in identifying the shooter, Theodore Smedley (hereinafter "Smedley"), later testifying against Smedley before a grand jury.  Smedley apparently committed the murder in retribution for the prior shooting of his [brother], Dorian Smedley. Following this testimony, Smedley was charged with, inter alia,

_____

[1]  18 Pa.C.S.A. §§ 901(a), 2501(a).

[2]  18 Pa.C.S.A. § 4953(a).

[3]  18 Pa.C.S.A. § 3301(a.1).

criminal homicide.  Soon thereafter, Mr. and Mrs. Jones were victims of an arson that caused significant damage to their home and serious bodily harm to the Jones[es], and their daughter, Amanda Schmitt.

[Appellant], Smedley's cousin, was charged with three counts of criminal attempt-criminal homicide; two counts of intimidation of a witness/victim; eight counts of arson-death or bodily injury; three counts of aggravated arson; two counts of arson endangering property; two counts reckless burning or exploding; one count of risking a catastrophe; and two counts of retaliation against a witness/victim, all in connection with the arson. . . .

Trial Court Opinion, 1/25/18, at 1-2 (unnecessary capitalization omitted).

On January 4, 2017, Appellant filed an amended motion in limine to exclude Commonwealth evidence.  Pertinently, Appellant sought to exclude expert testimony regarding historical cell-site analysis and Appellant's cell phone records.  The trial court granted Appellant's request for a Frye[4] hearing because it was "unaware of any published opinions finding that the use of historical cell[-]site analysis is generally accepted science."  Trial Court Opinion, 1/25/18, at 4.

The trial court conducted the Frye hearing on April 24, 2017, and thereafter denied Appellant's motion to exclude the expert testimony.  The case proceeded to trial.  On May 31, 2017, the jury found Appellant guilty on

_____

[4]  Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), adopted by Pennsylvania in Commonwealth v. Topa, 369 A.2d 1277 (Pa. 1977), provides that novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community.

all 23 counts. On August 25, 2017, the trial court sentenced Appellant to an aggregate 62 to 124 years of incarceration.

Appellant filed a timely post-sentence motion, which the trial court denied on September 12, 2017. Appellant filed this timely appeal. Both the trial court and Appellant have complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Appellant presents the following issues for review:

I.     DID THE LOWER COURT ERR IN FINDING THAT THE COMMONWEALTH HAD MET ITS BURDEN OF ESTABLISHING THAT THE TESTIMONY OF FBI SPECIAL AGENT JOHN HAUGER, REGARDING CELL PHONE TRACKING, WAS GENERALLY ACCEPTED IN THE SCIENTIFIC OR TECHICAL FIELD TO WHICH IT BELONGS, ASSUMING THAT THERE IS EVEN A SCIENTIFIC OR TECHNICAL FIELD TO WHICH IT BELONGS?

II.     WHETHER THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW AS TO THE CHARGES OF CRIMINAL ATTEMPT AT HOMICIDE?

III.     WHETHER THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW AS TO THE CHARGES OF RETALIATION AGAINST WITNESSES OR VICTIM (18 PA.C.S. § 4953([a])) WHERE THE EVIDENCE DID NOT DEMONSTRATE THAT [APPELLANT] KNEW THAT THE SPECIFIED VICTIMS HAD, IN FACT, BEEN A WITNESS OR THAT [APPELLANT] KNEW THAT THEY HAD BEEN SUCH, IN ORDER FOR HIM TO RETALIATE AGAINST THEM FOR SOMETHING DONE, SUCH AS PROVIDE TESTIMONY, AS A WITNESS IN A CIVIL MATTER?

IV.     DID THE LOWER COURT ERR IN NOT GRANTING A MISTRIAL AFTER THE IRRELEVANT AND PREJUDICIAL TESTIMONY OF COMMONWEALTH WITNESS TERRI CROWLEY STATING THAT SHE WAS NERVOUS ABOUT TESTIFYING BECAUSE SHE DID NOT WANT HER SON TO END UP DEAD AFTER IMPROPERLY OVERRULING AN OBJECTION TO TESTIMONY ABOUT CROWLEY'S STATE OF MIND?

V. WAS THE SENTENCE IMPOSED UPON APPELLANT MANIFESTLY UNREASONABLE, WHERE SUCH WAS A SENTENCE OF 62 TO 124 YEARS IMPOSED ON A TWENTY-SIX (26) YEAR OLD MAN, FOR AN ACT, WHICH CLEARLY WARRANTED SIGNIFICANT PUNISHMENT, BUT ONE FOR WHICH A FAR LESSER SENTENCE WOULD HAVE SATISFIED THE GOALS AND PURPOSES OF PENNSYLVANIA SENTENCING LAW AND THE PENNSYLVANIA SENTENCING GUIDELINES?

Appellant's Brief at 5-6.[5]

In his first issue, Appellant challenges the trial court's denial of his motion in limine seeking to exclude expert testimony regarding "historical cell-site analysis." Id. at 29-42. It is well-settled that the "[a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." Commonwealth v. Reese, 31 A.3d 708, 716 (Pa. Super. 2011) (internal citations omitted). With regard to Frye, the Pennsylvania Supreme Court has explained:

[A]s to the standard of appellate review that applies to the Frye issue, we have stated that the admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or

_____

[5] Appellant's Rule 1925(b) statement raised several errors complained of on appeal not presented in his appellate brief. See Rule 1925(b) Statement, 10/30/17, at unnumbered 1-5. Because Appellant abandoned these claims in his brief, we will not address them. See Appellant's Brief at 5-6; see also Commonwealth v. Briggs, 12 A.3d 291, 310 n.19 (Pa. 2011), cert. denied, 132 S. Ct. 267 (2011) (refusing to address claim appellant raised with trial court but subsequently abandoned in brief).

partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

Grady v. Frito-Lay, Inc., 839 A.2d 1038, 1046 (Pa. 2003) (internal citations omitted).

Appellant claims that the trial court erred by permitting Federal Bureau of Investigation (FBI) Special Agent John Hauger to testify about historical cell-site analysis. Appellant's Brief at 29. Specifically, Appellant asserts that "'[h]istorical cell-site analysis' is not a reliable form of science; there is no established methodology that yields certain results, and there is no general acceptance from a relevant scientific or technical community for this type of testimony." Id. at 29-30.

Conversely, the Commonwealth argues:

[T]he science of phones connecting to towers when they are within the tower's geographic range is not "new or novel" and th[e] use of the records of such connections is a generally accepted methodology in the field of cellular technology to determine a cell phone's general location and proximity to a tower. Thus, the trial court did not abuse its discretion by allowing Agent Hauger to testify about the towers to which [A]ppellant's phone connected during the early morning hours of June 21, 2015.

Commonwealth's Brief at 21. As to its decision to deny Appellant's motion, the trial court explained:

At the conclusion of the Frye [h]earing this Court determined that there was no evidence presented by Appellant to contradict the historical cell phone data produced which reflects a cell phone connecting to a particular cell tower, which thereby produces records which provide a generalized geographic area as to where a phone call was placed. Therefore, this Court determined that such data is not novel science in the cell phone record analysis community.

Trial Court Opinion, 1/25/18, at 6.  We agree.

Pennsylvania Rule of Evidence 702 governs expert witness testimony. It states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;  and
>
> (c)  the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.  "However, to be admissible under Rule 702, evidence must not only be beyond the knowledge possessed by [a] layperson, and assist the trier of fact to understand the evidence, but it also . . . must pass the Frye 'general acceptance' test."  Commonwealth v. Walker, 92 A.3d 766, 789 (Pa. 2014). "The Frye test provides that novel scientific evidence is admissible 'if the methodology that underlies the evidence has general acceptance in the relevant scientific community.'"  Id. at 789 (citing Grady, 839 A.2d at 1044).

Our Supreme Court further explained:

> [S]cientists are in a better position to evaluate the merits of scientific theory and techniques than judges.  With respect to application of the Frye standard, our Court has made it clear that Frye is not implicated every time science comes into the courtroom;  rather, it applies only to proffered expert testimony involving novel science.  Our Court has noted that a reasonably broad meaning should be ascribed to the term "novel," and a Frye

hearing is warranted when a trial judge has articulable grounds to believe that an expert witness has not applied accepted scientific methodology in a conventional fashion in reaching his or her conclusions. Further, what constitutes novel scientific evidence is usually decided on a case-by-case basis as there is some flexibility in the construction, as science deemed novel at the outset may lose its novelty and become generally accepted in the scientific community at a later date, or the strength of the proponent's proffer may affect the Frye determination.

Walker, 92 A.3d at 789-90 (internal citations and quotations omitted). As noted by this Court, the Frye test has two components:

First, the party opposing the evidence must show that the scientific evidence is "novel" by demonstrating that there is a legitimate dispute regarding the reliability of the expert's conclusions. If the moving party has identified novel scientific evidence, then the proponent of the scientific evidence must show that the expert's methodology has general acceptance in the relevant scientific community despite the legitimate dispute.

Commonwealth v. Foley, 38 A.3d 882, 888 (Pa. Super. 2012) (internal citations and quotations omitted), appeal denied, 60 A.3d 535 (Pa. 2013).

Consistent with the foregoing authority and our careful review of the record, we find that the trial court did not abuse its discretion in permitting Special Agent Hauger to testify about the science of historical cell-cite analysis and the "pinging" of Appellant's cell phone. As Appellant was the party opposing the admission of this evidence, at the time of his challenge, Appellant had the burden of "show[ing] that the scientific evidence is novel by demonstrating that there is a legitimate dispute regarding the reliability of the expert's conclusions." See id. Appellant failed to satisfy this burden. See Trial Court Opinion, 1/25/18, at 4-5. Appellant presented no evidence at the

hearing in support of the existence of a legitimate dispute regarding the novelty of historical cell-site analysis; in fact, Special Agent Hauger was the only witness to testify at the Frye hearing. See N.T., 4/24/17, at 1-69. Appellant's failure to identify historical cell-site analysis – in any respect – as novel scientific evidence, combined with the strength of the Commonwealth's proffer, see id., supports the trial court's ruling. We write further in response to the trial court's observation that this Court has not issued a published opinion addressing the admissibility of historical cell-site analysis.

Federal "[d]istrict courts that have been called upon to decide whether to admit historical cell-site analysis have almost universally done so." United States v. Hill, 818 F.3d 289, 297 (7th Cir. 2016) (citing United States v. Jones, 918 F.Supp.2d 1, 5 (D.D.C. 2013) (collecting cases)). Likewise, other

state courts, including Illinois,[6] Maryland,[7] New York,[8] and Washington,[9] have permitted the introduction of historical cell-site analysis to establish a cell phone's generalized geographic location without requiring the satisfaction of the second component of the Frye test.[10]

In Pennsylvania, this Court has affirmed a trial court's determination that historical cell-site analysis was not novel under the Frye test, but has done so in non-precedential unpublished memoranda. See Commonwealth v. Baker, 454 MDA 2016 (Pa. Super. Aug. 1, 2017) (unpublished

_____

[6] People v. Fountain, 62 N.E.3d 1107, 1124 (Ill. App. Ct. 2016) ("Regardless whether historical cell site evidence is scientific, the use of cell phone location records to determine the general location of a cell phone is not 'new' or 'novel' and has been widely accepted as reliable by numerous courts throughout the nation.").

[7] Stevenson v. State, 112 A.3d 959, 967 (Md. Ct. Spec. App. 2015) ("The cell phone location evidence at issue here is not novel scientific evidence, so Frye [] is not applicable.").

[8] People v. Littlejohn, 112 A.D.3d 67, 73 (N.Y. App. Div. 2013) ("[T]he Supreme Court properly denied his request for a Frye hearing with regard to this evidence, since the expert testimony proffered by the prosecution did not concern a novel scientific theory, technique, or procedure, but instead involved deductions made from cell phone site data in a manner consistent with a generally accepted scientific process.").

[9] State v. Ramirez, 425 P.3d 534, 543 (Wash. Ct. App. 2018) ("With respect to the Frye standard, cell site location testimony is not novel; it is widely accepted throughout the country.").

[10] "If the moving party has identified novel scientific evidence, then the proponent of the scientific evidence must show that the expert's methodology has general acceptance in the relevant scientific community despite the legitimate dispute." Foley, 38 A.3d at 888.

memorandum at 24-28); Commonwealth v. Watson, 900 MDA 2013 (Pa. Super. Aug. 11, 2014) (unpublished memorandum at 9-11). But see Superior Court Operating Procedure § 65.37(A) ("An unpublished memorandum decision shall not be relied upon or cited by a Court or a party in any other action or proceeding[.]").

More generally, we have affirmed a trial court's decision to qualify an expert in the area of historical cell-site analysis. See Commonwealth v. Latham, 2702 EDA 2010 (Pa. Super. Mar. 17, 2014) (unpublished memorandum at 5-6); Commonwealth v. Page, 2625 EDA 2010 (Pa. Super. Mar. 7, 2014) (unpublished memorandum at 5); Commonwealth v. Walker, 630 EDA 2010 (Pa. Super. Jul. 14, 2017) (unpublished memorandum at 9-10). We have also upheld convictions in cases where expert testimony regarding historical cell-site analysis has been introduced into evidence. Commonwealth v. Cooley, 3474 EDA 2016 (Pa. Super. Mar. 28, 2018) (unpublished memorandum); Commonwealth v. Gooden, 3506 EDA 2016 (Pa. Super. Apr. 18, 2018) (unpublished memorandum); Commonwealth v. Heyward, 1408 EDA 2015 (Pa. Super. Jul. 22, 2016) (unpublished memorandum); Commonwealth v. Smith, 3884 EDA 2016 (Pa. Super. Apr. 16, 2018) (unpublished memorandum); Commonwealth v. Wicker, 819 EDA 2014 (Pa. Super. Aug. 13, 2015) (unpublished memorandum); and Commonwealth v. Davis, 3194 EDA 2015 (Pa. Super. Nov. 2, 2016) (unpublished memorandum).

The absence of precedential case law has no effect on scientific evidence's novelty. Commonwealth v. Safka, 95 A.3d 304, 308 (Pa. Super. 2014). The determination of whether certain technology is "novel" scientific evidence "turns on whether there is a legitimate dispute regarding the reliability of the expert's conclusions, which is not necessarily related to the newness of the technology used in developing the conclusions." Id. at 307-308 (internal citation omitted). Further:

> [N]ovelty is not restricted to new science, and even bedrock scientific principles may be subject to a Frye analysis if those principles become disputed. Conversely, where there is no dispute, Frye should be construed narrowly so as not to impede admissibility of evidence that will aid the trier of fact in the search for truth.

Foley, 38 A.3d at 888 (internal citation and quotations omitted).

Instantly, Special Agent Hauger testified that historical cell-site analysis is conducted primarily by the FBI's Cellular Analysis Survey Team (CAST), which formed in 2009 and now includes 60 law enforcement members across the country who are specifically trained by the cell phone companies' engineers to analyze their customers' cell phone records. N.T., 4/24/17, at 5-6. Special Agent Hauger – who is a CAST member – explained that the cell phone companies make their cell tower databases available to CAST for use in historical cell-site analysis. CAST performs historical cell-site analysis to aid in criminal prosecutions, the exoneration of potential suspects, and the locating of kidnapping victims. Id. at 18-20. In addition to attending an initial six-week training program, CAST members attend yearly training at which cell

phone companies update CAST members on evolving cell phone technology. N.T., 5/25/17, at 707. At trial, Mr. Joseph Sierra, a custodian of records for the T-Mobile cell phone company, corroborated the testimony of Special Agent Hauger regarding CAST. N.T., 5/25/17, at 659-693. Mr. Sierra testified that T-Mobile "no longer" provides the company's engineers to testify in court proceedings, and instead "teaches and trains" the FBI CAST group, and when the company receives requests for expert testimony regarding historical cell-site analysis, they refer the inquiries to the FBI CAST Group. Id. at 692-693.

Special Agent Hauger further testified that every time someone places a call or sends a text message using a cell phone, the company providing the cellular service to that phone records the usage. N.T., 5/25/17, at 709. Companies record the number making the call, the number called, the date and time the call occurs, the duration of the call, and the particular cell tower, and/or sector of that tower, to which the cell phone connects. Id. Cell phone companies maintain records for various reasons, including billing. Id. Special Agent Hauger described historical cell-site analysis as the process of analyzing records maintained by the cellular service companies to plot on a map what tower(s) and sector(s) a phone used to connect to the provider's network. Id. at 708-709. The data is used to determine a cell phone's general geographic location at the time the phone was used to place a call or send a text message. Id.

We note the detail with which Special Agent Hauger testified:

[COMMONWEALTH]: Can you explain to the jury what exactly historical cell site analysis is?

[SPECIAL AGENT HAUGER]: Sure. Every time you use your phone, any time anybody uses your phone for a call, text message, that sort of thing, that's recorded by the cell phone companies. What number you called, what number called you, the date and time that happened, the duration of the call, and what tower or sector the phone chose to make the initial connection.

Those are housed at the cell phone companies, they keep track of it for various reasons, most importantly to bill you accurately. So when they produce a line that has a tower list, or it has a tower where the phone connected, I take a tower list that is provided by the company, marry it up to the tower list and a call detail record, and plot on a map where that call was, or what tower and sector that phone used to connect to the network.

It's very important to know that despite what you may have seen in the movies or on Netflix or whatever, you can't tell the location, the exact location of where a phone was in time, historically. So I can't tell you if the phone was at the corner of Grant Street and you know, a particular street at any given time. I can't say it was 123 Main Street at some point in time; but I can say that it used a particular tower and sector.

N.T., 5/25/17, at 708-710.

To reiterate, historical cell-site analysis is the process of analyzing records maintained by cellular service companies to make a general geographic determination of what tower(s) and/or sector(s) a phone used to connect to a provider's network. Upon review, we conclude that there exists no legitimate dispute regarding the reliability of historical cell-site analysis, and we therefore construe Frye "narrowly so as not to impede [the] admissibility of" the Commonwealth's historical cell-site analysis evidence. See Foley, 38 A.3d at 888. Accordingly, we hold that scientific evidence

concerning historical cell-site analysis is not novel, and its admissibility is not subject to the requirements of Frye. Appellant's first issue is without merit.

In his second issue, Appellant challenges the sufficiency of evidence as to his three attempted homicide convictions. In reviewing the sufficiency of evidence:

> A claim challenging the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. . . . When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

Commonwealth v. Dale, 836 A.2d 150, 152 (Pa. Super. 2003) (internal citations omitted). "In conducting our review, we consider all of the evidence actually admitted at trial and do not review a diminished record." Id.

Appellant alleges that "[t]he evidence was insufficient as to the charges of [c]riminal [a]ttempt – [h]omicide (18 Pa.C.S.[A.] § 901(a)) because Appellant lacked the requisite specific intent." Appellant's Brief at 42. Appellant argues that because the basis for his attempted homicide convictions was criminal activity involving arson, an enumerated crime for purposes of felony murder, he cannot be convicted of attempted homicide based on the intent required for second-degree murder. Id. at 44-45. Further, Appellant argues that the "evidence was insufficient to show that Appellant had the intent to kill by lighting a fire." Id. at 45.

In Pennsylvania, "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of that crime." 18 Pa.C.S.A. § 901(a). The crime of criminal homicide is defined as follows:

> (a) Offense defined.--A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.

18 Pa.C.S.A. § 2501(a). Therefore, "if a person takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act, he may be convicted of attempted murder." Commonwealth v. Tucker, 143 A.3d 955, 964 (Pa. 2016) (internal citation omitted), appeal denied, 165 A.3d 895 (Pa. 2017).

Our review of the record confirms that the Commonwealth presented sufficient evidence for the jury to convict Appellant of three counts of attempted homicide. Although Appellant is correct in his assertion that arson is a specifically enumerated crime for purposes of felony murder[11], he is incorrect that the basis for an attempted homicide conviction cannot be arson. While malice or intent to commit the underlying felony are the requisite mens rea requirements for second-degree murder,[12] if it is established that the

_____

[11] 18 Pa.C.S.A. § 2502(b) (murder of the second degree).

[12] "The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim." Commonwealth v. Lambert, 795 A.2d 1010 (Pa. Super. 2002).

perpetrator of an arson holds the specific intent to kill, depending on the results, he may be properly convicted of either attempted homicide, or first-degree murder. Commonwealth v. Pierce, 786 A.2d 203, 208-210 (Pa. 2001) (setting intentional fire to an occupied residence resulting in three deaths as the basis of defendant's three first-degree murder convictions).

Therefore, if there was sufficient evidence for the jury to find that Appellant had the specific intent to kill the victims in this case, then the convictions of attempted homicide were properly based upon Appellant's criminal actions involving setting fire to the victims' residence.

In rejecting Appellant's sufficiency claim, the trial court recognized that circumstantial evidence alone may support a finding of the requisite specific intent to kill for an attempted homicide conviction. Trial Court Opinion, 1/25/18, at 7; see Tucker, 143 A.3d at 964 (internal citation omitted) ("The Commonwealth may establish the mens rea required for first-degree murder, specific intent to kill, solely from circumstantial evidence."). The court explained:

> The facts in this case, when viewed in the light most favorable to the Commonwealth, clearly support the guilty verdict on the charges of criminal attempt-homicide. Specifically, Appellant set fire to a residential home where it was established through circumstantial evidence that Appellant knew people resided. Specifically, the testimony revealed that Appellant, a cousin of Smedley, wanted to prevent Mr. and Mrs. Jones from testifying at Smedley's murder trial. Furthermore, Appellant set the fire in the early morning hours when the victims were more likely to be home sleeping, rendering them helpless. Trial Transcript, Vol. I pp. 178 (Firefighter James Tarbert testifying the dispatch call for the fire occurred at approximately 4:52 a.m.). Additionally, Appellant set

the fire to the residence's entry and exit in an effort to ensure that Mr. and Mrs. Jones would not be able to escape the burning building. Trial Transcript Vol[.] I pp. 229-235.

Trial Court Opinion, 1/25/18, at 7. We agree with the trial court's conclusion that the evidence, viewed in the light most favorable to the Commonwealth, supported the jury's finding of every element of Appellant's three attempted homicide convictions beyond a reasonable doubt.[13] See Dale, 836 A.2d at 152.

In his third issue, Appellant alleges that there was insufficient evidence to support his convictions of retaliation against a witness, victim, or party, as provided in 18 Pa.C.S.A. § 4953. Appellant argues "the crime of [r]etaliation [a]gainst [w]itness, [v]ictim or [p]arty seems to only apply to acts done to a witness in a civil proceeding." Appellant's Brief at 48. More generically, Appellant claims that "[t]he evidence is far from clear that Appellant knew they had been a witness in any legal matter." Id. at 49. The Commonwealth "submits that the evidence supports the conclusion that both [A]ppellant and Theodore Smedley[] knew that Mr. and Mrs. Jones had cooperated in the case against Smedley, [and] had testified in the grand jury proceeding against him

_____

[13] Although Appellant may have only held the specific intent to kill Mr. and Mrs. Jones for their witness-roles in the criminal proceedings against his relative, the doctrine of transferred intent permits his intent to kill the Joneses to be transferred to Amanda Schmitt. See Commonwealth v. Gaynor, 648 A.2d 295, 299 (Pa. 1994) (affirming first-degree murder conviction where intent to kill intended target was transferred to innocent bystanders that were killed).

- 17 -

and were scheduled to testif[y] at Smedley's murder trial in July of 2015." Commonwealth's Brief at 44. Notably, the Commonwealth concedes that the record may not support a conviction under Section 4953. See id. at 44-45 ("[A]ppellant correctly points out that §[]4953 pertains to retaliation for anything lawfully done in the capacity of witness, victim or party in a civil matter. . . . Consequently, this Court may determine that the evidence was insufficient with regard to these charges.") (internal quotations omitted).

Section 4953 provides:

(a) Offense defined.--A person commits an offense if he harms another by any unlawful act or engages in a course of conduct or repeatedly commits acts which threaten another in retaliation for anything lawfully done in the capacity of witness, victim or a party in a civil matter.

18 Pa.C.S.A. § 4953(a).

We first address Appellant's argument that Section 4953 is inapplicable because the record fails to reflect that Mr. and Mrs. Jones testified in a civil matter. In review of Section 4953 and its application by Pennsylvania appellate courts, both Appellant and the Commonwealth are incorrect that Section 4953 only applies to witnesses or victims in civil matters.

Prior to December 20, 2000, Section 4953 read: "[a] person commits an offense if he harms another by any unlawful act in retaliation for anything lawfully done in the capacity of witness or victim." 18 Pa.C.S.A. § 4953(a) (prior version). However, the current version, which took effect on December 20, 2000, added the phrase "or a party in a civil matter." 18 Pa.C.S.A. §

4953(a).  Since coming into effect, the statute has been applied, by both the Pennsylvania Supreme Court and this Court, to victims and witnesses in criminal proceedings.  See, e.g., Commonwealth v. Ostrosky, 909 A.2d 1224, 1232-1233 (Pa. 2006) (holding that Section 4953 did not apply to victims of a criminal proceeding only because a single threat did not result in objective harm to victims); Commonwealth v. Brewer, 876 A.2d 1029 (Pa. Super. 2005) (affirming conviction under Section 4953 of retaliation against witnesses in a criminal proceeding), appeal denied, 887 A.2d 1239 (Pa. 2005).  We therefore conclude, mindful of relevant case law and the rules of statutory interpretation,[14] that retaliation against victims or witnesses in criminal proceedings may be properly prosecuted under Section 4953.

With regard to Appellant's sufficiency of the evidence claim that Appellant was unaware that Mr. and Mrs. Jones were witnesses in the criminal case against Smedley, the trial court explained:

> The evidence in this case, when viewed in the light most favorable to the Commonwealth, establishes that Mr. and Mrs. Jones witnessed a homicide outside their residence during the afternoon of March 24, 2014; that Mrs. Jones cooperated with police in identifying the shooter, Theodore Smedley; that Mr. and Mrs. Jones testified for the Commonwealth before a grand jury in the homicide case against Smedley; [and] that jail cell phone calls between Appellant and Smedley referred to Jones' testimony and discussed setting the fire to [] their residence.  Accordingly, the

_____

[14]  See 1 Pa. C.S.A. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.  Every statute shall be construed, if possible, to give effect to all its provisions.").

evidence was sufficient to support a guilty verdict on all counts of . . . [r]etaliation against [w]itness or [v]ictim.

Trial Court Opinion, 1/25/18, at 8.

We agree with the trial court's conclusion that the evidence, viewed in the light most favorable to the Commonwealth, supports the jury's finding of every element of Appellant's convictions of retaliation against witness, victim or party, beyond a reasonable doubt. See Dale, 836 A.2d at 152. Appellant's third issue lacks merit.

Appellant's fourth issue challenges the trial court's denial of his motion for mistrial. Our standard of review of an order granting a mistrial is as follows:

> In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interest but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, . . . assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with the law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

Commonwealth v. Baldwin, 158 A.3d 1287, 1293 (Pa. Super. 2017) (internal citation omitted), appeal denied, 170 A.3d 992 (Pa. 2017).

In alleging the trial court erred in denying his request for a mistrial, Appellant argues that "[d]uring Terri Crowley's testimony on May 25, 2017, irrelevant and prejudicial testimony was allowed by the lower court." Appellant's Brief at 50.  Appellant asserts:

> [T]he testimony was irrelevant as to Appellant's guilt in any of the charges lodged against him.  Not only was the testimony irrelevant, it was extremely prejudicial to Appellant. Nevertheless, the lower court allowed in the testimony and did not grant a mistrial.  This was an error that caused harm to Appellant.

Id.  Appellant takes issue with the following questioning of Terri Crowley by the Commonwealth:

> [COMMONWEALTH]:    Ms. Crowley, were you nervous about coming to testify in this trial?
>
> [MS. CROWLEY]: Yes.
>
> [COMMONWEALTH]:    Were you nervous about your son, Dorian, coming to testify in this trial?
>
> [DEFENSE COUNSEL]:  I am going to object.  I don't understand -- there is no relevance to whether she is nervous or about whether her son is nervous.
>
> [TRIAL COURT]:  Overruled.
>
> [MS. CROWLEY]: Yes.
>
> [COMMONWEALTH]:    Why?
>
> [MS. CROWLEY]: I don't want him to end up dead.
>
> [TRIAL COURT]:  I am sorry, I didn't hear?

- 21 -

[COMMONWEALTH]:     Take your time.

[MS. CROWLEY]:  I said, I don't want him to end up dead.

N.T., 5/25/17, at 615-616.

Immediately after this testimony, defense counsel requested a sidebar where both he and the Commonwealth argued:

> [DEFENSE COUNSEL]:   I am going [to] move for a mistrial, in light of that her opinion would be completely irrelevant.  I am going to move for a mistrial.  That is extremely prejudicial.  She is up here crying.  I saw that coming, I objected, and now she went and said what she said.  I am moving for a mistrial.
>
> [COMMONWEALTH]:     My response, your Honor, is that the objection was overruled, her state of mind as to -- it goes directly in tandem with the Facebook post that she observed, the contents of those Facebook posts that her son was being threatened and that her son was living with her at the time; that she felt threatened, she still came in here and testified today.  Dorian Smedley testified under the same context yesterday that he was being threatened, felt threatened by [Appellant], and it's under the same line of testimony that he gave yesterday.
>
> [TRIAL COURT]:  I am going to deny the motion for mistrial.

N.T., 5/25/17, at 616-617.

Evidence must be competent and relevant before it is admitted in a criminal proceeding.  Commonwealth v. Freidl, 834 A.2d 638 (Pa. Super. 2003).  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[.]"  Pa.R.E. 401(a).  However, Rule 403 states that "[t]he court may exclude relevant evidence if its probative values is outweighed by a danger of one or more of the following:

unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

In finding the evidence to be relevant, the trial court stated:

> A theme throughout this trial as presented by the Commonwealth was the importance of family to Appellant. Throughout the trial, the evidence established that Dorian Smedley and Appellant categorized themselves as cousins. Dorian Smedley was originally arrested in connection with this arson but later advised police that it was . . . Appellant that was responsible for it. Dorian Smedley subsequently testified accordingly for the Commonwealth against Appellant at the trial. Terri Crowley's testimony that she was nervous for her son to testify is relevant because this factors into the jury's findings as to the credibility of Dorian Smedley. Furthermore, Mrs. Crowley's statements relate to the Facebook photographs on Appellant's Facebook page depicting a memorial, which the Commonwealth alleges were posted by Appellant as a threat to Dorian Smedley for speaking to the police and providing Appellant's name as the perpetrator of the fire. Accordingly, this Court found that the evidence was not only legally relevant but the admission of said statements did not deprive Appellant of a fair and/or impartial trial.

Trial Court Opinion, 1/25/18, at 9-10 (citation to notes of testimony omitted).

Upon review, we discern no error in the trial court's determination that Ms. Crowley's testimony was relevant to the credibility of the Commonwealth's key witness, Dorian Smedley, and did not deprive Appellant of a fair and impartial trial. We further note that Ms. Crowley's testimony was cumulative of the evidence that Appellant was attempting to deter Dorian Smedley from testifying. See N.T., 5/25/17, at 440, 613-15, 813-14 (evidencing Appellant's reaction when he encountered Smedley while they were both incarcerated, Appellant's threatening Facebook posts towards Smedley, and Appellant's

statements about Smedley when Appellant arrested).  Thus, the trial court did not abuse its discretion in denying Appellant's motion for mistrial.

In his fifth and final issue, Appellant challenges the discretionary aspects of his sentence, asserting that in imposing "essentially a life sentence," the "sentencing court clearly let emotion overrule logic."  Appellant's Brief at 57-58.

"The right to appellate review of the discretionary aspects of a sentence is not absolute, and must be considered a petition for permission to appeal." Commonwealth v. Buterbaugh, 91 A.3d 1247, 1265 (Pa. Super. 2014), appeal denied, 104 A.3d 1 (Pa. 2014).  "An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence."  Id.  We conduct this four-part test to determine whether:

> (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post[-]sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.

Commonwealth v. Baker, 72 A.3d 652, 662 (Pa. Super. 2013) (citation omitted), appeal denied, 86 A.3d 231 (Pa. 2014).  "A defendant presents a substantial question when he sets forth a plausible argument that the sentence violates a provision of the sentencing code or is contrary to the fundamental norms of the sentencing process."  Commonwealth v. Dodge,

77 A.3d 1263, 1268 (Pa. Super. 2013) (quotations and citations omitted), appeal denied, 91 A.3d 161 (Pa. 2014).

Here, Appellant has complied with the first three prongs of this test by raising his discretionary sentencing claims in a timely post-sentence motion, filing a timely notice of appeal, and including in his brief a Rule 2119(f) concise statement. See Appellant's Brief at 26-28. Therefore, we examine whether Appellant presents a substantial question for review.

Appellant argues that the trial court erred because "the sentence imposed upon Appellant was manifestly unreasonable." Appellant's Brief at 57. Specifically, he alleges "[t]he trial court did not, in imposing what is effectively a life sentence, state sufficient reasons on the record." Id. at 61. This argument presents a substantial question for our review. See Commonwealth v. Malovich, 903 A.2d 1247, 1253 (Pa. Super. 2006) (finding a substantial question where an appellant argued the trial court did not state on the record its reasons for sentencing).

Because Appellant has satisfied each of the criteria for invoking our review of his discretionary sentencing claim, we turn to the merits of his argument.[15] The relevant standard of review is as follows:

_____

[15] However, we note that Appellant's argument focusing on the disparity in sentencing between him and Theodore Smedley, who is not his co-defendant in the present case, is meritless. Appellant's Brief at 59-61. The trial court did not abuse its discretion in failing to compare Appellant's sentence to that of Theodore Smedley, as doing so would itself be an abuse of discretion. See

Sentencing is a matter vested in the sound discretion of the sentencing judge. The standard employed when reviewing the discretionary aspects of sentencing is very narrow. We may reverse only if the sentencing court abused its discretion or committed an error of law. A sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision. We must accord the sentencing court's decision great weight because it was in the best position to review the defendant's character, defiance or indifference, and the overall effect and nature of the crime.

Commonwealth v. Cook, 941 A.2d 7, 11-12 (Pa. Super. 2007) (internal quotations and citations omitted).

First, Appellant claims that the trial court failed to "discuss the invidualized factors bearing on Appellant's circumstances," and "the trial court imposed its sentence without really stating any reasons for the rather harsh sentence." Appellant's Brief at 58, 61. "When imposing a sentence, a court must consider the factors set forth in 42 Pa.C.S.A. § 9721(b)." Commonwealth v. Feucht, 955 A.2d 377, 383 (Pa. Super. 2008), appeal denied, 963 A.2d 467 (Pa. 2008). The relevant portion of Section 9721(b) states:

In selecting from the alternatives set forth in subsection (a), the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the

_____

Commonwealth v. Luketic, 162 A.3d 1149, 1165 (Pa. Super. 2017) ("It . . . is an abuse of discretion to base one defendant's sentence on the sentence imposed on another defendant.") (citations omitted).

rehabilitative needs of the defendant. . . . In every case in which the court imposes a sentence for a felony or misdemeanor . . . the court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed.

42 Pa.C.S.A. § 9721(b). In doing so, "[t]he court is not required to parrot the words of the Sentencing Code, stating every factor that must be considered under Section 9721(b). However, the record as a whole must reflect due consideration by the court of the statutory considerations." Feucht, 955 A.2d at 383.

At sentencing, the trial court stated:

I haven't been in the criminal division as long as [counsel for Appellant and the Commonwealth] have been in the criminal division, but I will tell you that in my two brief years here, this is one of the hardest cases to deal with. Not hard in terms of imposing a penalty, but hard in terms of listening to victims come to trial and come to the sentencing hearing to tell me how these events have affected their lives. And it's also hard to listen to [Appellant's] mother and sister come in here and tell me how it's affected their lives and give me the reasons and the background to the life of [Appellant] and the subsequent sentencing.

You know it's tripe because judges sit on the bench and at the end of the day say that there are no winners and there are no losers because nobody wins here, everybody loses. But to look at the Jones[es] and see and hear and understand how much pain and suffering they've gone through because of what you did, [Appellant], is extraordinary. And their lives are forever changed, and their lives will be lived out with the fear and the emotional trauma of what happened back in [June] of 2015. They will continue their lives, hopefully, with closure that this matter is done and that, hopefully, justice is served. But I would imagine that you, Mrs. Jones and Mr. Jones, will never go to sleep at night, and you, Amanda Schmitt, too, without there being a memory of what happened back in [June] of 2015.

I understand, [Appellant], that there has been a background of abuse and neglect but that doesn't help the Jones[es]. That doesn't help Amanda Schmitt. And it's interesting because the theme of this trial, essentially, was your position that only the family mattered. But it's interesting that it seemed like it was only your family that mattered and not anybody else's family. It wasn't the Jones[es], and it wasn't Amanda Schmitt.

And I agree with the Commonwealth, this is not the Commonwealth versus Mr. Smedley. This is your case. And you took the active steps on the night in question to essentially silence two people who had witnessed a murder. And you took those steps by coming up to their place of residence and attempting to burn down their house and kill them. I don't know what else there is to say.

I've considered the victim impact statements, I've considered the statements of your family members, I've considered your apology, the fact that you said you were sorry[.]

N.T., 8/25/17, at 30-32.

Our review of the sentencing hearing, including the above remarks by the trial court, establishes that the trial court considered the appropriate factors and provided proper reasoning in determining Appellant's sentence. The trial court discussed the impact of Appellant's actions on the victims, the role Appellant played in the commission of the crimes, Appellant's remorse, and his background of abuse and neglect. Although the trial court did not indicate at sentencing that it had reviewed a pre-sentence investigation report, we note that one was ordered and Appellant's sentencing was delayed by the trial court for its preparation. See N.T., 5/31/17, at 212; Baker, 72 A.3d at 663 ("When a sentencing court has reviewed a presentence investigation report, we presume that the court properly considered and

weighed all relevant factors in fashioning the defendant's sentence."). Despite Appellant's arguments, the trial court, in its discretion, determined that the gravity of the crimes necessitated a 62 to 124 year sentence. Thus, the record reflects that the trial court weighed the appropriate factors and sufficiently stated its reasons for sentencing on the record.

Appellant also claims that the trial court abused its discretion for failing to state sufficient reasons for imposing an aggravated range sentence at count three-attempted homicide. Appellant's Brief at 61-62. However, Appellant incorrectly states that the standard range sentence was 78 to 96 months. With a prior record score of three, and an offense gravity score of 14 assigned to attempted homicide, the correct standard range sentence was 120 months to the statutory limit (longest maximum sentence), which in this case, would be 240 months. See 204 Pa.Code § 303.16(a). As the trial court sentenced Appellant at count three-attempted homicide to 120 to 240 months, he received a standard range sentence. Thus, the trial court's reasons for Appellant's sentence were appropriate and we discern no abuse of discretion.

For the foregoing reasons, Appellant's issues are without merit, and we affirm the judgment of sentence.

Judgment of Sentence affirmed.

P.J.E. Bender joins the Opinion.

Judge Shogan files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/18/2019