J-S12041-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN ANTHONY VEGA | : | |
| | : | |
| Appellant | : | No. 1692 EDA 2020 |

Appeal from the PCRA Order Entered September 2, 2020
In the Court of Common Pleas of Carbon County Criminal Division at
No(s):  CP-13-CR-0000395-2009

BEFORE:  LAZARUS, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                              Filed: May 20, 2021

John Anthony Vega ("Vega") appeals from the Order dismissing his

Petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA").

**See** 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

This Court previously set forth the factual history underlying this appeal

as follows:

> Evidence at trial established that on two separate dates an
> intruder broke into [the victim's] home during the early morning
> hours and sexually assaulted her.  At the time of these assaults,
> [the victim] was a seventy-seven[-]year-old widow. The assaults
> occurred on October 21, 2007 ("2007 assault")[,] and May 31,
> 2008 ("2008 assault").
>
> On October 21, 2007, [the victim] was in the living room of
> her home in Palmerton, Carbon County, Pennsylvania[,] watching
> television.  At around one o'clock in the morning, she left the living
> room to use the bathroom.  During this time, a masked intruder
> entered the home and followed her into the bathroom.  [The
> victim] testified that the intruder was wearing all black and a mask
> from the movie Scream.  Further, [the victim] testified that the
> intruder was around five[-]foot[,] seven [inches tall,] and spoke

with a slight Spanish or Puerto Rican accent. Testimony at trial showed that this description matched [Vega].

Inside the bathroom, the intruder told [the victim] "he came to rape her." The intruder then approached [the victim] and a struggle began causing both the intruder and [the victim] to fall to the floor. Once on the floor, [the victim] continued to resist. This notwithstanding, the intruder fondled [the victim's] vagina. As the struggle continued, [the victim] told the intruder that if he raped her, she could die because she was suffering from Parkinson's disease, high blood pressure, and high cholesterol. After hearing this, the intruder ended the attack and left. Before he left, he said, "I'll be back."

Once the intruder left, [the victim] noticed that her phone wires were disconnected and that her underwear had been taken from a laundry basket and hung on various objects throughout the home. The Pennsylvania State Police were called to investigate. Unfortunately, no evidence was found that identified the intruder. The police did find a makeshift mask made from a pair of [the victim's] shorts at the scene, but this was not the mask described by [the victim], and testing did not yield any results.

Seven months later[,] an intruder again entered [the victim's] home. This occurred during the early morning hours of May 31, 2008, while [the victim] was watching television. As she was going to the kitchen, she was attacked in the hallway. At trial, [the victim] identified her assailant as the same person from the 2007 assault. This time, however, the intruder was wearing all black and a ski mask. [The victim] testified that the intruder said, "I'm back. I'm here to finish what I came for before, the first time." The intruder then grabbed [the victim] and forced her to the ground. While on the ground, the two wrestled. The intruder fondled [the victim's] vagina, and he removed her underwear.

Fortunately, [the victim] was not living alone when this second assault occurred. In the seven months since the first assault, [the victim] rented a room in her home to [a roommate]. [The victim's] screams for help during the attack awoke [her roommate]. [The roommate] ran out of her room into the hallway. As she did so, the intruder ended the attack and ran out of [the victim's] home.

The Pennsylvania State Police were called a second time to investigate. This time, police discovered two pieces of evidence that identified the intruder as [Vega]. First, police lifted a palm print from a windowsill on the outside of [the victim's] home. Police found a step stool beneath the window and determined the intruder entered the home at this location. Two experts for the Commonwealth testified that the palm print found matched [Vega's]. While the experts could not determine the exact time [Vega] left this print, one of the experts, [Pennsylvania State] Trooper Phillip Barletto, testified that outdoor elements easily destroy finger and palm prints, implying the print was fresh. Further, no evidence was presented to provide an innocent explanation why [Vega's] palm print would be on the outside of [the victim's] windowsill when neither she nor [the roommate] knew [Vega] or gave him permission to be at the home.

Second, on the interior windowsill of the same window from which the police lifted the palm print, police found an unopened box of condoms. The condoms were manufactured by Associated Wholesalers, Incorporated. Police contacted Associated, who advised they distributed condoms of the type found in a Convenient Food Mart in Palmerton. Sales receipts from this store were obtained[,] which showed that a box of condoms was purchased at 11:14 [p].[m]. on the night of the 2008 assault. Next, police obtained surveillance video from the Convenient Food Mart for the time of this purchase. The video depicted a customer who strongly resembled [Vega] and was wearing a shirt with the words "encendido" printed across the front[,] buying condoms of the same type as those found in the victim's home. Later, police found a shirt matching that in the video in a search of [Vega's] home.

Based on this evidence, on March 27, 2009, the Commonwealth filed a Criminal Complaint against [Vega] for both the 2007 and 2008 assaults. In this [C]omplaint, [Vega] was charged for each date with one count of attempted rape by forcible compulsion, burglary, criminal trespass, and indecent assault. He was also charged with one count of simple assault related to the 2008 assault. A jury trial began on January 7, 2013[,] and ended on January 9, 2013. At its conclusion, the jury found [Vega] guilty of all charges.

….

- 3 -

> … [Vega] was … sentenced to an aggregate [term] of thirteen to thirty-one years' incarceration in a state correctional facility. [Vega] was then thirty years old. The sentence was made consecutive to sentences [Vega] was then serving in Northampton and Lehigh counties for similar offenses. At the time of sentencing, [Vega] was also serving a forty-six-month sentence in a federal penitentiary.
>
> On May 10, 2013, [Vega] filed a timely post-sentence [M]otion[,] which was denied by [O]rder dated September 3, 2013.

*Commonwealth v. Vega*, 104 A.3d 49 (Pa. Super. 2014) (unpublished memorandum at 1-3) (brackets omitted). This Court affirmed Vega's judgment of sentence, and our Supreme Court denied Vega's Petition for allowance of appeal. *See id.*, *appeal denied*, 102 A.3d 985 (Pa. 2014).

On October 22, 2015, Vega filed the instant, *pro se*, PCRA Petition, his first. The PCRA court appointed Vega counsel, who filed a Petition to Withdraw and a "no-merit" letter pursuant to *Turner*/*Finley*.[1] Vega subsequently filed a Motion to proceed *pro se*. The PCRA court granted counsel's Petition to Withdraw and appointed new counsel for Vega.[2] On September 6, 2016, Vega's new counsel filed an Amended PCRA Petition. Following a hearing, the PCRA court dismissed the Amended PCRA Petition. Vega filed a timely Notice

---

[1] *Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988); *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

[2] The PCRA court did not explicitly deny Vega's Motion to proceed *pro se*. However, in its Order appointing Vega's new counsel, the PCRA court noted that Vega's request to proceed as his own counsel "is a matter which should be discussed" with his new counsel. Order, 7/11/2016.

of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Vega now presents the following question for our review:

Whether the [PCRA] [c]ourt erred in its finding that the failure to call [] Vega's girlfriend, Melissa Ballas [("Ballas")], as an alibi witness did not deny effective assistance of counsel where the failure to call such an important exculpatory witness was clearly prejudicial and it was simply not reasonable strategy not to present in an otherwise weak case for the Commonwealth? Whether this alibi would have created a reasonable doubt as to [] Vega's presence at the scene of the crime?

Brief for Appellant at 5.

"The standard of review of an order dismissing a PCRA petition is whether that determination is supported by the evidence of record and is free of legal error." **Commonwealth v. Weimer**, 167 A.3d 78, 81 (Pa. Super. 2017). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." **Id.** (citation omitted).

Vega argues that his trial counsel was ineffective in failing to present Ballas as an alibi witness at his trial. Brief for Appellant at 10-13. Vega points to Ballas's testimony at the PCRA hearing in support of his claim. **Id.** at 7, 11-13. Specifically, regarding the October 2007 assault, Ballas testified that at the time of the October 2007 assault, Vega was with her at her apartment in Emmaus, Pennsylvania. **Id.** Ballas stated that Emmaus is a thirty-five to forty-five minute drive from the victim's home. **Id.** at 7, 11. Regarding the May 2008 assault, Ballas testified that she spoke with Vega on the phone at 1:10 a.m. on the morning of the May 2008 assault. **Id.** Vega also points out

that, according to his phone records, his cell phone signal connected with a cell tower in Whitehall, which is approximately a fifteen to twenty-five minute drive from the victim's home. *Id.* at 7-8, 11. According to Vega, this testimony proves that he could not have committed the assaults; trial counsel's decision to not present this testimony lacked a reasonable basis; and Vega was prejudiced as a result. *Id.* at 11-13.

To prevail on a claim of ineffective assistance of counsel under the PCRA, a petitioner must plead and prove, by a preponderance of the evidence, that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). Specifically,

> [t]o be entitled to relief on an ineffectiveness claim, a PCRA petitioner must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different. *Commonwealth v. Chmiel*, … 30 A.3d 1111, 1127 (Pa. 2011) (employing ineffective assistance of counsel test from *Commonwealth v. Pierce*, … 527 A.2d 973, 975-76 (Pa. 1987)). Counsel is presumed to have rendered effective assistance. Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim. Finally, because a PCRA petitioner must establish all the *Pierce* prongs to be entitled to relief, we are not required to analyze the elements of an ineffectiveness claim in any specific order; thus, if a claim fails under any required element, we may dismiss the claim on that basis.

*Commonwealth v. Treiber*, 121 A.3d 435, 445 (Pa. 2015) (footnote and some citations omitted).

Relating to the reasonable basis prong, generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests. Courts should not deem counsel's strategy or tactic unreasonable unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.

*Commonwealth v. Durrett King*, 195 A.3d 255, 259 (Pa. Super. 2018) (quotation marks, brackets and citations omitted).

In its Opinion, the PCRA court cogently and thoroughly addressed Vega's claim, and concluded that it lacks merit. *See* PCRA Court Opinion, 9/1/20, at 4-8, 10-21. Specifically, the PCRA court determined that Vega's underlying claim lacks arguable merit and trial counsel had a reasonable basis for not calling Ballas as a witness. *Id.* The PCRA court further concluded that even if Vega's claim had merit, he did not suffer prejudice as a result of Ballas not being called as a witness. *Id.* We agree with the sound reasoning and determinations of the PCRA court, as set forth in its Opinion, and we affirm thereon regarding Vega's claim. *See id.*

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/20/21

IN THE COURT OF COMMON PLEAS OF CARBON COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :

            vs.            :    NO.   395 CR 2009

JOHN ANTHONY VEGA,
    Defendant

Cynthia Dyrda-Hatton, Esquire         Counsel for Commonwealth
District Attorney
John J. McMahon, Esquire             Counsel for Defendant

## MEMORANDUM OPINION

Nanovic, P.J. – September 1, 2020

Defendant was convicted of sexually assaulting a seventy-seven-year-old widow in her home twice within a period of seven months, each time after breaking into the home. On direct appeal, the Pennsylvania Superior Court affirmed Defendant's judgement of sentence on May 15, 2014; the Pennsylvania Supreme Court denied Defendant's allowance of appeal on October 23, 2014. Before us is Defendant's claim that his trial counsel was ineffective for failing to call Defendant's girlfriend as a potential alibi witness to the first assault and to use records of cell phone calls Defendant made at the time of the second assault to pinpoint Defendant's location and thereby demonstrate the resulting unlikelihood or improbability of Defendant committing the second assault. For the reasons which follow, we deny Defendant's Petition for Relief under the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.

## PROCEDURAL AND FACTUAL BACKGROUND

On October 21, 2007, at approximately 1:00 A.M., June Fields was in her home at 3885 Fireline Road in Palmerton preparing to retire for the night. Fields was seventy-seven years old and lived alone. As she was in the bathroom, Defendant

APPENDIX "A"
1

suddenly appeared, threatened to rape her, and began to digitally penetrate her. Fields begged for her life and told Defendant she was ill, and that if he did what he threatened to do, it would kill her. Defendant stopped and fled Fields' home threatening to return. (N.T., 1/8/13, p.104).

The October 21, 2007, assault was promptly reported to the state police, however, there were no leads and the police were unable to determine who assaulted Fields. At the time of the assault, Defendant was dressed entirely in black and wore a mask of the type used in the movie Scream. Fields did not recognize Defendant or know who he was. Other than being able to describe his clothing and the mask worn, the only other information Fields was able to provide was that her assailant was approximately 5'7" in height and spoke with a slight Spanish or Puerto Rican accent.

Defendant returned to Fields' home on May 31, 2008, sometime between midnight and 1:00 A.M. (N.T., 1/8/13, pp.106, 137, 154, 176, 205-206, 209; N.T., 1/9/13, p.308; N.T., 8/29/18, pp.81, 84, 126). This time, Defendant attacked Fields in the hallway of her home saying, "I'm back. I'm here to finish what I came for before, the first time." (N.T., 1/8/13, p.106). Defendant grabbed Fields and forced her to the floor where he pulled down her underwear and touched her vagina. As Fields screamed for help and fought back, a third person now boarding in Fields' home was awoken and entered the hallway where Fields was being attacked. At this point, Defendant ended his attack and ran out of the home.

During the May 31, 2008, attack, Defendant again wore only black, but this time was wearing a ski mask. Fields identified the person who attacked her on May 31, 2008, as the same person who had broken into her home on October 21, 2007. (N.T.,

1/8/13, p.107).    This time, however, the state police were able to determine the identity of the assailant.

Defendant's palm print was found on the outside of a window used by the attacker to gain access to Fields' home and where a stepstool had been placed. Further, an unopened box of condoms left by the intruder was found by the inside of this same window. Based upon the brand and type of condom, the police were able to trace the purchase of condoms of the same brand and type to a Convenient Food Mart in Palmerton at 11:14 P.M. on the night of the 2008 assault. A surveillance video of this convenience store recorded the purchase. The customer strongly resembled Defendant and was wearing a shirt with the word *ENCENDIDO*[1] printed across the front. A search of Defendant's home found a shirt of the same type. (N.T., 1/9/13, pp.251-52).

On January 9, 2013, after a three-day trial beginning on January 7 and ending on January 9, 2013, Defendant was convicted of two counts of Attempted Rape by Forcible Compulsion,[2] two counts of Burglary,[3] two counts of Criminal Trespass,[4] two counts of Indecent Assault by Forcible Compulsion,[5] and one count of Simple Assault.[6] As noted earlier, the merits of Defendant's direct appeal to the Superior Court were denied, as was his request for allowance of appeal.

On October 22, 2015, Defendant filed a *pro se* Petition for Collateral Relief, his first. Therein, Defendant claimed, *inter alia*, that his trial counsel was ineffective for failing to adequately investigate Defendant's claim of alibi and to present alibi

---

[1] In Spanish, *ENCENDIDO* means fiery or passionate. (N.T., 1/9/13, p.264).
[2] 18 Pa.C.S.A. §§ 901, 3121 (a)(1).
[3] 18 Pa.C.S.A. § 3502.
[4] 18 Pa.C.S.A. § 3503(a)(1)(i).
[5] 18 Pa.C.S.A. § 3126(a)(2).
[6] 18 Pa.C.S.A. § 2701(a)(1).

witnesses, including Melissa Ballas, who were available to the defense and willing to testify at trial. Defendant specifically claimed that Ballas was with him on October 21, 2007, at 1:00 A.M. and that phone records showed she was on the phone with him at 1:10 A.M. on May 31, 2008. Attached to Defendant's PCRA Petition was the following signed and notarized statement of Ballas dated October 15, 2015:

> I informed the Pennsylvania State Police and all of John Vega's attorneys, including trial counsel Kent Watkins, that on both mornings of the incidents in question that John was either with me or on the phone with me. I told them that on October 21, 2007, John and I shared an apartment and I was always with him, it would be extremely unlikely that he wouldn't have been there that night. I also told them on the night/early morning of May 31, 2008, I definitely remember speaking with John late/night early morning. His phone records later show that I did, in fact, speak with John at 1:11 a.m.

(N.T., 8/29/18, p.53; Commonwealth Exhibit No.1.). Ballas admitted preparing this document on or about October 15, 2015, at Defendant's request for use with his Petition. (N.T., 8/29/18, pp.51-52, 74).

Other than Ballas, Defendant has identified no other alibi witness who he claims were available and willing to testify at trial and whom trial counsel was made aware of. PCRA counsel was originally appointed for Defendant and filed a no-merit letter. Defendant's present counsel has been privately retained.

A hearing on Defendant's Petition was held on August 29, 2018. At this hearing, Ballas was the sole witness called by Defendant. Ballas testified that she first met Defendant at a party at Defendant's cousin's home on October 20, 2004, that they began a romantic relationship shortly thereafter, and that they were living together in an apartment in Emmaus, Pennsylvania at the time of both the October 21, 2007, and May 31, 2008, incidents. (N.T., 8/29/18, pp.12-14, 26). Ballas also testified that October 20, 2007, was a Saturday, that she and Defendant spent the entire weekend together -

this being the third anniversary of their meeting - and that other than Defendant leaving for approximately fifteen minutes late Saturday to purchase some cigarettes, they were together the entire time. (N.T., 8/29/18, pp.11, 15-17). This apartment, Ballas testified, was a thirty-five to forty-minute drive from Fields' home. (N.T., 8/29/18, p.17).

As to May 31, 2008, Ballas testified that she tried telephoning Defendant unsuccessfully two times on May 31, 2008 – at 12:41 A.M. and 12:49 A.M. – before he returned her call at 1:10 A.M. (N.T., 8/29/18, pp.32-33). Defendant's cell phone records, which were provided to the defense in response to discovery and which Ballas referred to in her testimony, show a forty-nine-second phone call from Defendant to Ballas at 1:10 A.M. with the cell phone signal connecting with a cell tower at 3880 Lehigh Street, Whitehall, Pennsylvania, a distance of approximately seventeen miles from Fields' home, with a driving time of approximately fifteen to twenty-five minutes. (N.T., 8/29/18, pp.26-27, 30-33, 42-46, 125-26, 130; Defendant Exhibit No.1). Accepting the premise that the cell tower used to transfer Defendant's cell phone signal was the one closest to his location at the time of the call, Defendant argued it was physically impossible for him to have been in Fields' home at the time Fields stated (*i.e.*, approximately 1:00 A.M.) and to have also driven a distance of seventeen miles to make this call.

Ballas testified she told Watkins several times what she knew about Defendant's whereabouts at the time of each offense with which he was charged, about her review of Defendant's cell phone records with Watkins, and that the cell phone records were ones Watkins received in discovery from the Commonwealth. (N.T., 8/29/18, pp.20-23, 26, 29-30, 43, 69-70; Defendant Exhibit No.1 (cell phone records)).

Attorney Watkins, Defendant's trial counsel, testified at the PCRA hearing as a witness on behalf of the Commonwealth. He was not present in the courtroom when Ballas testified. Watkins admitted speaking with Ballas on several occasions – both in person and on the phone - and discussing the phone call from Defendant to Ballas on May 31, 2008, and using the cell phone tower through which the call was transmitted as a means of determining Defendant's location, but had no recollection and appeared doubtful of ever being told that Ballas was with Defendant in Emmaus on October 21, 2007. (N.T., 8/29/18, pp.79-82, 100-101, 104, 107-108, 111-115, 119-120, 122). Watkins acknowledged that given the passage of time, he did not have an independent recollection of every detail of what Ballas told him (N.T., 8/29/18, pp.91, 105), and agreed that Ballas was ready, willing and able to testify on Defendant's behalf.[7]

When questioned about why he did not call Ballas at trial as an alibi witness for the October 21, 2007, assault and to cast doubt on Defendant's whereabouts for the May 31, 2008, assault, Watkins testified it didn't fit his theory of the defense: to highlight the generic description of the intruder given by Fields and how non-specific it was; to force the Commonwealth to prove Defendant was in Fields' home and not somewhere else at the time of the assault; and to challenge the Commonwealth's theory that Defendant entered and exited Fields' home through a window too small for a person of his size, without leaving any fingerprints or clothing fibers. (N.T., 1/7/13, pp.22, 95-96; N.T., 1/9/13, pp.306, 308-310; N.T., 8/29/18, pp.82-83, 90-92). Watkins had a plan to discredit the palm print evidence and cast doubt on the significance of the pictures taken by the security camera at the convenience store. (N.T., 1/7/13, pp.51-52, 90-91;

---

[7] The PCRA hearing was held more than five years after the date of trial. At the hearing, it was clear that Watkins had not reviewed his file in preparation for the hearing. (N.T., 8/29/18, p.105). Nor did Watkins bring his case file or any notes he may have taken to the hearing. (N.T., 8/29/18, p.101).

N.T., 1/8/13, p.232; N.T., 1/9/13, pp.307-308; N.T., 8/29/18, pp.22, 25, 44, 46-47, 93-94). He did not want to present any evidence that Defendant was out of his home on May 31, 2008, at a time when he would have been capable of committing the assault, and Ballas had him out at 1:10 A.M. and earlier given the two phone calls she made preceding this return call. (N.T., 8/29/18, pp.82-83, 85, 90-92, 112-116, 119). Watkins also testified he discussed with Defendant his concerns about calling Ballas as a witness and use of Defendant's cell phone records, and that Defendant was in agreement with his decision not to call Ballas. (N.T., 8/29/18, pp.94-95).

Notwithstanding Watkins' general lack of recollection, there were a number of additional items Watkins testified to of significance. First, approximately five months before Defendant's trial in Carbon County, Defendant was tried and convicted by a jury in Lehigh County of charges of the same nature, under similar circumstances: breaking into an elderly woman's home late at night and sexually assaulting her. (N.T., 1/9/13, p.282; N.T., 8/29/18, pp.55, 81). In preparation for trial, Watkins read the full transcript of the Lehigh County trial at which the evidence tying Defendant to the attacks against Fields was admitted. (N.T., 8/29/18, pp.79-80).[8] From that, Watkins knew the May 31, 2008, telephone records offered little to the defense, that multiple entries in those records indicated telephone calls made to and by Defendant for drug trafficking, that Ballas positively identified Defendant as the person purchasing the condoms from the Convenient Food Mart in Palmerton an hour or two before the May 31, 2008, assault, and that Ballas, who testified as an alibi witness for Defendant in the Lehigh County proceedings, was not believed by the jury. (N.T., 8/29/18, pp.34-35, 41-42, 44, 46, 56,

---

[8] A CD of the entire trial proceedings held in Lehigh County was marked and admitted as an exhibit at the PCRA hearing. (N.T., 8/29/18, pp.136-137; Commonwealth Exhibit No.2).

60-61, 68-70, 80, 90-94, 125, 127, 134-35). Watkins testified as well that notwithstanding the location of the cell tower involved in transmitting Defendant's telephone call to Ballas on May 31, 2008, this did not establish the location from which the call was made since, among other things, if the load on the cell phone tower closest to where the call was made was backed up, the signal would automatically transfer to another cell tower to relay the message. (N.T., 8/29/18, pp.82, 85, 113).

## DISCUSSION

A criminal defendant's right to counsel under the Sixth Amendment to the United States Constitution, with which Article I, Section 9 of the Pennsylvania Constitution is coextensive, requires not merely the right to have counsel present at trial, but the right to have the effective assistance of counsel in order to preserve the defendant's right to due process and ensure a fair trial. Commonwealth v. Diaz, 226 A.3d 995, 1007-1008 (Pa. 2020). To obtain post-trial collateral relief, a PCRA petitioner must plead and prove that trial counsel's performance was deficient and that the deficiency prejudiced the petitioner. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Commonwealth v. Pierce, 527 A.2d 973, 975-77 (Pa. 1987) (applying a three-factor analysis to the "performance and prejudice" standard articulated in Strickland).

> To plead and prove ineffective assistance of counsel a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act. Where the petitioner fails to plead or meet any elements of the above-cited test, his claim must fail.

> A claim has arguable merit where the factual averments, if accurate, could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination.

The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Commonwealth v. Stewart, 84 A.3d 701, 706-707 (Pa.Super. 2013) (en banc) (citations and quotation marks omitted), appeal denied, 93 A.3d 463 (Pa. 2014); see also Commonwealth v. Kimball, 724 A.2d 326, 330-32 (Pa. 1999).

Additionally, when reviewing a claim that counsel was ineffective for failing to call a witness,

[a] failure to call a witness is not per se ineffective assistance of counsel as such decision generally involves a matter of trial strategy. To establish a claim that counsel was ineffective for failing to call a witness, a defendant must establish that the witness existed and was available, that counsel was informed of the witness's existence, that the witness was ready and willing to testify and that the absence of the witness prejudiced the defendant to a point where the defendant was denied a fair trial.

Commonwealth v. Moser, 921 A.2d 526, 531 (Pa.Super. 2007); Commonwealth v. Selenski, 228 A.3d 8 (Pa.Super. 2020). Finally, in reviewing a claim that counsel was ineffective, counsel is presumed to be effective with the burden resting upon the PCRA petitioner to prove by a preponderance of the evidence that counsel's performance was deficient and that such deficiency prejudiced him. Commonwealth v. Smith, 181 A.3d 1168, 1174-75 (Pa.Super. 2018), appeal denied, 193 A.3d 344 (Pa. 2018); see also Commonwealth v. Colavita, 993 A.2d 874, 897 (Pa. 2010) (holding the Commonwealth

bears no burden of proof with respect to a claim of ineffectiveness of counsel under the PCRA).

When considering the Strickland/Pierce criteria for evaluating whether counsel was ineffective, not every factor needs to be considered since the failure to meet even one is fatal to a finding that counsel was ineffective. Commonwealth v. Mason, 130 A.3d 601, 618 (Pa. 2015). This notwithstanding, we believe it appropriate in this case to examine each prong of the Strickland/Pierce analysis.

### Arguable Merit of Defendant's Claim

Given the fact that there were only two witnesses to the October 21, 2007, assault - Fields and the assailant – and the general description of the assailant given by Fields, Defendant's claim of an alibi for this date is of arguable merit. However, counsel cannot be faulted for failing to present evidence of which he was unaware.

Basic to Defendant's claim that Watkins was ineffective for failing to call Ballas as an alibi witness with respect to the October 21, 2007, assault is that Watkins was told Defendant was with Ballas in Emmaus on October 21, 2007, at the time of the assault and, therefore, could not have assaulted Fields. "An alibi is a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." Commonwealth v. Johnson, 966 A.2d 523, 537 n.5 (Pa. 2009) (citation and quotation marks omitted). We do not find Ballas credible on this point.

We note first that Watkins was apprised of Ballas' existence and her relationship with Defendant, that he met with her on at least one occasion and spoke with her by telephone on several other occasions regarding the substance of her testimony - if not every detail - and reviewed what she had testified to in Lehigh County, and knew as well

that she was ready and willing to testify and was, in fact, available as she attended the trial. These discussions however dealt primarily with the May 31, 2008, assault, the telephone call at 1:10 A.M. on that date, and where Defendant was located at the time of the call. (N.T., 8/29/18, pp.81, 111).

When Watkins was questioned at the PCRA hearing about Ballas' claim that Defendant was with her on October 21, 2007, it was clear that Watkins did not recall being told this and, by his demeanor, questioned whether he ever was. (N.T., 8/29/18, pp.104, 107-108, 111, 119-20, 122). Trooper Judge, who participated in the investigation of both the Carbon County and Lehigh County charges and was present at every meeting with Ballas, testified unequivocally that Ballas never told him of this claimed alibi which is clearly contrary to what Ballas wrote in her October 15, 2015, statement. (N.T., 8/29/18, pp.63-64, 128). Furthermore, in this statement written by Ballas almost eight years after the event, Ballas wrote, "I told them that on October 21, 2007, John and I shared an apartment and I was always with him, it would be extremely unlikely that he wouldn't have been there that night." Yet, by the time of the PCRA hearing, another three years later, Ballas testified without equivocation that she knew for a fact Defendant was with her because it was their anniversary, and even recalled how he went out late that evening to purchase a pack of cigarettes across the street.

Ballas had been in a romantic relationship with Defendant for almost nine years, still cared for him, and, without doubt, embellished her testimony to help him. This was further evident during the Lehigh County trial where Ballas not only sought to provide Defendant with another alibi with respect to the Lehigh County charges, but was caught in multiple inconsistencies when she attempted to do so. (N.T., 8/29/18, pp.91,

134-35).[9] Simply put, we do not find Ballas' alibi testimony regarding October 21, 2007, to be credible and do not believe Watkins was ever informed prior to trial about this claimed alibi.

Whether Defendant's claim of ineffectiveness for not calling Ballas as a witness to the May 31, 2008, telephone call and using the location of the cell tower as a means of determining Defendant's location at the time of the call is of arguable merit must also be addressed. In contrast to a true alibi defense, Ballas was not with Defendant at the time of the assault on May 31, 2008. At most, Ballas could testify that she received a cell phone call from Defendant at 1:10 A.M. on May 31, which was approximately ten minutes after the time of the assault as testified to by Fields. Although this evidence by itself does not raise a true alibi defense or make it impossible for Defendant to have assaulted Fields, Ballas testified at the PCRA hearing, without objection, that the cell tower which received Defendant's cell phone signal and transmitted the call to her was located at 3880 Lehigh Street in Whitehall, Lehigh County, Pennsylvania. (N.T., 8/29/18, p.42).[10] Even assuming that Ballas was competent to give this testimony, Ballas was clearly not qualified to determine the location of Defendant's cell phone and, by extension, the whereabouts of Defendant in relation to the cell tower. See Commonwealth v. Nevels, 203 A.3d 229, 240 (Pa.Super. 2019) (describing the initial six-week training program with yearly updates provided by cell phone companies to members of the FBI's Cellular Analysis Survey Team ("CAST") before being qualified to provide expert testimony with respect to historical cell-site analysis described "as the

___

[9] During the Lehigh County trial, Ballas was not permitted to testify as an alibi witness for the October 21, 2007, events in Carbon County because of a failure to provide advance notice to the Commonwealth. (N.T., 8/29/18, pp.67-68).

[10] Ballas appears to have used an instructional manual provided by Defendant's cell phone provider, Sprint, to identify the location of the cell tower which picked up Defendant's cell phone signal. (N.T., 8/29/18, pp.7, 42; Defendant Exhibit No.1b). How this was done was never explained by Ballas.

process of analyzing records maintained by the cellular service companies to plot on a map what tower(s) and sector(s) a phone used to connect to the provider's network. The data is used to determine a cell phone's general geographic location at the time the phone was used to place a call or send a text message."), *aff'd*, 2020 WL 4758615 (Pa. 2020).

Knowing the location of the cell tower a phone uses to connect to a provider's network is not alone sufficient to give the location of the phone at the time of the call. As testified to by the Commonwealth's expert in Nevels:

> It's very important to know that despite what you may have seen in the movies or on Netflix or whatever, you can't tell the location, the exact location of where a phone was in time, historically. So I can't tell you if the phone was at the corner of Grant Street and you know, a particular street at any given time. I can't say it was 123 Main Street at some point in time; but I can say that it used a particular tower and sector.

Nevels, 203 A.3d at 240-41.

For instance, Ballas did not testify and was not qualified as an expert to testify as to whether cell phones connect to the nearest provider's specific cell tower; whether any other Sprint cell tower existed between Fields' home and the tower in Whitehall with which Defendant's phone would otherwise have connected had he been making the call from some other location closer to Fields' home; whether, as Watkins testified, if another tower was busy, the signal would be transferred to a more distant tower, such as the one in Whitehall; or what the signal strength and range or outer perimeter (*i.e.*, the coverage area) was for the cell tower which picked up Defendant's signal. Without this information, Ballas' bald assertion that Defendant was a half-hour drive away from Fields' home at the time this call was made and physically incapable of committing the assault at 1:00 A.M. is speculative and unreliable. All of this was Defendant's burden to meet at the PCRA hearing, and it was not met. *See also* Commonwealth v. Chmiel,

889 A.2d 501, 546 (Pa. 2005) ("Trial counsel's failure to call a particular witness does not constitute ineffective assistance without some showing that the absent witnesses' testimony would have been beneficial or helpful in establishing the asserted defense."). And while the argument can certainly be made that Watkins failed to conduct a reasonable investigation regarding this same information, even if this is true, without knowing the answers to these questions, on what basis can it be determined that Defendant was prejudiced by Watkins' failure to investigate.[11]

<u>Reasonable Basis of Trial Counsel's Conduct</u>

Whether counsel's course of action lacked an objective reasonable basis is the second <u>Strickland/Pierce</u> factor. Watkins testified repeatedly that the decision not to call Ballas as a witness was a tactical decision, that he wanted to keep Defendant as distant as he could from Fields' home without raising the possibility of Defendant being close enough to have committed the assaults. While Ballas' proffered testimony for

---

[11] In <u>Commonwealth v. Johnson</u>, 966 A.2d 523 (Pa. 2009), the Pennsylvania Supreme Court stated:
> Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary. . . . The duty to investigate, of course, may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, *unless pursuant to a reasonable strategic decision*, may lead to a finding of ineffective assistance.

966 A.2d at 535-36 (emphasis added).

Watkins made a strategic decision not to present any evidence that Defendant was not at home at the time Fields was assaulted on May 31, 2008. Through investigation, Watkins had also learned that the call tower to which a cell phone signal is transmitted is not necessarily the tower closest to the location from which the call is placed. Whether Watkins should have conducted further investigation on this point can certainly be questioned, however, with what Watkins knew - including the uncertainty of the exact time of the assault, sometime between 12:00 A.M. and 1:00 A.M., with this variance providing ample opportunity for Defendant to have assaulted Fields and still been present at the cell tower at 1:10 A.M. (N.T., 8/29/18, pp.126, 129) - and in light of his chosen strategy, the decision not to investigate further may well have been warranted. Nevertheless, even if Watkins' failure to investigate the cell phone records further were found to be unreasonable, <u>Commonwealth v. Steele</u>, 961 A.2d 786, 825 (Pa. 2008) ("reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation"), and not excused by trial strategy, <u>Commonwealth v. Basemore</u>, 744 A.2d 717, 735 (Pa. 2000) ("Strategic choices made following less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation."), an unexcused failure to make a reasonable investigation is not *per se* prejudicial or entitle a defendant to <u>Strickland</u> relief. <u>Johnson</u>, 966 A.2d at 536.

October 21, 2007, was entirely consistent with that objective and with counsel's trial strategy, her testimony concerning May 31, 2008, put Defendant outside his home, within striking distance of Fields, and overall would have strengthened the Commonwealth's case.

In evaluating whether counsel's actions lacked an objective reasonable basis, critical to making this evaluation is the fact that Defendant was being tried at one time for two separate assaults connected by their similarity to one another and what was said: both involved a masked intruder dressed in black with an Hispanic accent breaking into an elderly woman's home late at night to sexually assault her; both involved the same home, the same victim and, as testified to by the victim, the same assailant; and the assailant in the first assault stated, "I'll be back" and, in the second assault, "I'm back."

By itself, the case against Defendant for the first attack was weak: an unidentified stranger entering Fields' home dressed in black, wearing a Scream-like mask, with no ties to Defendant. In contrast, the evidence linking Defendant to the second attack was difficult to refute: a security video depicting a person resembling Defendant purchasing condoms from a convenience store within a mile of the victim's home, within an hour of the assault (N.T., 1/8/13, p.199; N.T., 8/29/18, pp.62, 127); a palm print matching Defendant's found on the outside of the victim's window; and a box of condoms of the same brand and type as those purchased at the convenience store found inside the victim's home after the assault. Nevertheless, possible room for doubt existed: the store video was of poor quality and the clerk only saw the purchaser on one occasion, late at night, for a brief moment; and not only is fingerprint analysis an inexact science having, as it does, a subjective element subject to differences of opinion, at least one of

the lines from the latent palm print lifted from the exterior window sill of Fields' window did not appear to match the known palm print from Defendant. (N.T., 1/7/13, pp.51-52, 90-91; N.T., 1/8/13, p.232; N.T., 1/9/13, pp.307-308). If additional evidence also showed Defendant was in fact in the area at the time of the assault, this could be devastating to the defense. This was the dilemma trial counsel faced if he put Ballas on the stand.

Absent what happened on May 31, 2008, the Commonwealth's case against Defendant for October 21, 2007, was weak. The possibility that Defendant may have been the intruder only became known because of the May 31, 2008, assault for which the Commonwealth had strong, albeit not ironclad evidence connecting Defendant to this offense. While Ballas' testimony about May 31, 2008, could cast further doubt on whether Defendant was at Fields' home on that date, it came at a hefty price: Ballas definitively identified Defendant as the person in the videotape [12] and it placed Defendant in the area of the assault, at the time of the assault, with time to commit the assault. (N.T., 8/29/18, pp.126, 129). Moreover, it came with the realization that Ballas knew multiple other calls on Defendant's cell phone records for May 31, 2008, involved drug dealing — in fact, Ballas acknowledged being with Defendant in Palmerton earlier in the day on May 30, 2008, when Defendant was selling drugs (N.T., 8/29/18, pp.34-35, 41-42) — which, if made known to the jury, would be devastating. [13]

---

[12] At trial, the Commonwealth called the sales clerk at the convenience store as part of its case-in-chief. At no time during her testimony did the sales clerk testify Defendant was the person who purchased the condoms on May 31, 2008, or that Defendant was the person depicted in the videotape. The clerk's testimony was presented primarily to authenticate the tape. (N.T., 1/8/13, pp.210-215).

[13] Defendant did not testify at either his jury trial or the PCRA hearing. When colloquized at trial, Defendant's criminal record contained a number of *crimen falsi* convictions with which Defendant might be impeached. (N.T., 1/9/13, pp.282-84; N.T., 8/29/18, pp.82, 86-87, 90). Additionally, had Defendant testified about his phone call to Ballas at 1:10 A.M. on May 31, 2008, he would likely have been subject to cross-examination on the earlier two missed phone calls from Ballas and other phone calls made by him that evening, with the risk that his drug dealing would be disclosed. (N.T., 8/29/18, pp.82, 89). This risk

Additionally, and certainly not controlling, Watkins knew that Ballas testified for Defendant during the Lehigh County trial five months earlier, at which the allegations and evidence linking the Defendant to the Carbon County assaults was placed in evidence under Pa.R.E. 404(b)(2), and that Ballas' testimony was of no benefit.

In examining whether a "reasonable basis" exists for trial counsel's actions where matters of strategy and trial tactics are in issue, given the many intangibles involved, review of trial counsel's conduct is deferential. Commonwealth v. Rivers, 786 A.2d 923, 930 n.5 (Pa. 2001). "Trial counsel will be deemed to have acted reasonably if the course chosen by trial counsel had some reasonable basis designed to effectuate his client's interests." Commonwealth v. Miller, 987 A.2d 638, 653 (Pa. 2009). "Moreover, a claim of ineffectiveness will not succeed by comparing, in hindsight, the trial strategy that trial counsel actually employed with the alternatives forgone," Miller, 987 A.2d at 653 - even if the alternatives forgone offered a more logical course of action – as long as counsel's decisions had a reasonable basis. Mason, 130 A.3d at 618. This is not to say the PCRA court "disregard[s] completely the reasonableness of other alternatives available to counsel," however, "the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis." Commonwealth v. Cooper, 941 A.2d 655, 664 (Pa. 2007) (citation and quotation marks omitted). "[A] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." Mason, 130 A.3d at 618 (citation and quotation marks omitted).

was eliminated by Defendant's decision not to testify. Had Ballas testified, whether she would have been cross-examined about her knowledge of Defendant's other calls would have depended on what she

The dilemma Watkins faced on whether to call Ballas as a witness was not an easy one. Under the circumstances the choice made, to forgo Ballas' testimony, had a reasonable basis and the alternative, to have Ballas testify, did not offer a significantly greater potential chance for success. *See also* Commonwealth v. Charleston, 94 A.3d 1012, 1019 (Pa.Super. 2014), *appeal denied*, 104 A.3d 523 (Pa. 2014).

## Prejudice

The third and final factor to be considered under the Strickland/Pierce standard is prejudice: was Defendant prejudiced by counsel's deficient conduct. "In order to meet the prejudice prong of the ineffectiveness standard, a defendant must show that there is a reasonable probability that but for the act or omission in question the outcome of the proceeding would have been different." Commonwealth v. Wallace, 724 A.2d 916, 921 (Pa. 1999).[14] "When a defendant challenges a conviction, the question is whether

_____

testified to on direct examination. (N.T., 8/29/18, p.4). While this risk might have been slight, the risk nevertheless existed.

[14] Prejudice, as so defined, requires that the PCRA court consider the totality of the evidence presented by the Commonwealth at the original trial and the evidence presented in defense, to which must be added the evidence adduced at the PCRA hearing; re-weigh all such evidence; and determine whether the absence at trial of the evidence presented at the PCRA hearing creates a reasonable probability that the verdict would have been different. Commonwealth v. Johnson, 2020 WL 4211747 **4, 5 (Pa.Super. 2020) (en banc) (citing and quoting from Andrus v. Texas, __ U.S. ___, 140 S.Ct. 1875, ___ L.Ed.2d __ (2020)).

In making this evaluation, the PCRA court is required to assess the credibility of the witnesses presented at the PCRA hearing. Commonwealth v. Johnson, 966 A.2d at 540.

> In assessing credibility . . ., the question for the PCRA court is not whether the jury in fact would have credited [Defendant's] new evidence and his recast alibi evidence. Instead, the question is whether the nature and quality of the evidence is such that there is a reasonable probability that the jury would have credited it and rendered a more favorable verdict. That assessment must include a recognition of the impeachability of the witnesses, and not merely a viewing of their testimony in a most favorable light.

*Id.* at 542.

As already discussed in the text, we found Ballas' testimony that she told Watkins she was with Defendant in Emmaus on October 21, 2007, at the time of the assault to be biased and not credible. Further, while we have accepted Ballas' testimony that she was on the phone with Defendant on May 31, 2008, at 1:10 A.M. for forty-nine seconds, we are not convinced that this testimony without additional foundational testimony from an expert witness as to Defendant's location (or that of his cell phone) at the time of the call, as well as the extrinsic dangers which accompanied it (*i.e.*, Ballas' positive identification of Defendant on the security videotape, placing Defendant outside his home in close proximity to Fields, and knowledge of Defendant's drug dealing), creates a reasonable probability that the outcome of the trial would have been different.

APPENDIX "A"
18

there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695, 104 S.Ct. 2052. "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence; it means only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." Commonwealth v. Johnson, 174 A.3d 1050, 1056 (Pa. 2017) (citation and quotation marks omitted). "Such a showing effectively demonstrates that counsel's ineffectiveness 'so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place,' as required by Section 9543(a)(2)(ii) of the PCRA." Wallace, 724 A.2d at 921.

In analyzing this factor, we repeat what we said earlier: Defendant has failed to meet his burden of showing the cell phone call at 1:10 A.M. on May 31, 2008, was made by Defendant from a location which precluded him from assaulting Fields between 12:00 and 1:00 A.M. on May 31, 2008, the timeframe within which the Commonwealth's evidence placed Defendant in Fields' home. (N.T., 8/29/18, pp.126, 129); cf. Commonwealth v. Johnson, 966 A.2d at 538 ("At the core of an alibi defense is, of course, consistency between the date and time of the crime and that of the defendant's alibi."). Without eliminating this possibility, Ballas' testimony placing .Defendant within striking distance of Fields' home at the time of the assault on May 31, 2008, would only have reinforced the strength of the Commonwealth's case against Defendant for the May 31, 2008, assault and, in the process, also hurt Defendant's chances of acquittal for the October 21, 2007, assault.

Ballas' testimony had the potential of undermining the defense strategy at its core. Added to this was Ballas' definitive identification of Defendant in the surveillance

video at the Convenient Food Mart and knowledge that Defendant was actively engaged in dealing drugs in the Palmerton area on the night of the assault. Given these risks and the strength of the Commonwealth's case as presented at trial, Defendant has not met his burden of demonstrating that had Ballas been called to testify and presented the testimony offered at the PCRA hearing, there is a reasonable probability the jury's verdict would have been different, that is, that the absence of Ballas' testimony denied Defendant a fair trial. *Cf.* Johnson, 966 A.2d at 540 ("To properly grant Strickland relief here, the PCRA court would have to find that the uncalled fact witnesses and the deficiently prepared alibi witnesses had relevant evidence that could have aided [Defendant's] defense, and that there is a reasonable probability that the introduction of such evidence would have altered the outcome of the trial. That assessment must necessarily include some measure of a finding that the witnesses were credible. . . .").

## CONCLUSION

"[T]he constitutional guarantee to effective assistance of counsel exists to ensure . . . a criminal defendant receives a fair trial." Commonwealth v. Diaz, 226 A.3d at 1008; Kimball, 724 A.2d at 330-32. While in hindsight perhaps a different strategy may have been pursued by trial counsel, we are not convinced that the strategy actually pursued did not have a reasonable basis in advancing Defendant's interests. As discussed, there were risks involved whether or not Ballas was called to testify; the record discloses a reasonable basis why trial counsel chose not to call Ballas; and we are not convinced that had Ballas testified, there is a reasonable probability the outcome of the trial would have changed, that without her testimony "no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. §

9543(a)(2)(i-ii). Defendant received a fair trial and that, ultimately, is what matters. Diaz, 226 A.3d at 1008.

BY THE COURT:

_____
                                    P.J.