J-A23029-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JULIUS L. ALLEN | : | |
| | : | |
| Appellant | : | No. 147 MDA 2021 |

Appeal from the Judgment of Sentence Entered December 23, 2020
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0005672-2018

BEFORE:   BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED OCTOBER 21, 2021**

Appellant, Julius L. Allen, appeals from the judgment of sentence of life imprisonment, and a consecutive term of 10-20 years' incarceration, imposed after he was convicted of first-degree murder[1] and burglary.[2]  After careful review, we affirm.

The trial court summarized the facts adduced at trial as follows:

Lashauna Thornton had been residing at 1309 Berryhill Street in the City of Harrisburg with Iesha Green and Kevin Royster for approximately two (2) months.  On September 27, 2018, an argument occurred over the payment of household bills.  Having decided to move out of the residence, Thornton went to the house the next day to retrieve her belongings.  With her was [Appellant], a close friend, and a friend of his only known to her as Squeegee. When they arrived at 1309 Berryhill Street, Thornton went into

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 3502.

the house alone and retrieved her belongings without incident. Her intention was to simply drive away.

However, [Appellant] began yelling to Green and Royster, who were inside the house, to come outside to fight him. Presumably intended for Royster, who was from Philadelphia, [Appellant] yelled "that Philly nigger, he a bitch." [Appellant] would not quiet down despite Thornton's repeated instructions for him to "shut up."

In response to the ongoing shouting, Green and Royster exited the house through their back door and saw that it was [Appellant] causing the commotion. [Appellant] stated to Royster that he was "going to choke [him] the fuck out" and proceeded to do so as Royster attempted to walk away. A fight ensued between [Appellant], Royster[,] and Green; with each giving and receiving various blows. At some point, Royster freed himself from the scuffle and retrieved a knife from inside the house. However, he returned it without having used it when instructed to do so by Green. During the fighting, [Appellant] suffered injuries which were described as his mouth being "busted." The fighting finally subsided when Green's mother arrived on scene, separated everyone, and told [Appellant] and Thornton to leave. [Appellant] later told Thornton that before leaving[,] he shouted to Green and Royster that he "would be back."

After dropping off Squeegee, [Appellant] and Thornton drove to [Appellant]'s grandmother's house in Mechanicsburg. Once there, [Appellant] told Thornton he wanted to go back to fight Royster. [Appellant] retrieved a shotgun, a jacket in which he wrapped the shotgun and gloves, all of which he put in the backseat of Thornton's car. He instructed Thornton to drive back to the area of the alley behind 1309 Berryhill Street, and she did so. Once back at the location, [Appellant] retrieved the shotgun from the back seat and walked to an open area between two (2) row homes. He returned shortly thereafter without the shotgun, got back in the car[,] and instructed Thornton to drive to his friend's house.

When they arrived, [Appellant] did not exit the vehicle but yelled to his friend to "meet him." He then directed Thornton to drive him to another house where his cousin lived. When Thornton dropped [Appellant] at his cousin's house, he gave her his cell phone and instructed her to answer it when it rang. Thornton drove to a Burger King on Paxton Street where she ordered food

- 2 -

and ate by herself. Security camera video established that Thornton was, in fact, at Burger King eating all alone.

[Appellant] proceeded without Thornton to a local informal drinking establishment known as the Speakeasy and met up with Joseph Cole, a family friend he had known for over twenty (20) years. Cole was also an acquaintance of Royster and knew him to be from Philadelphia. Cole noticed that [Appellant] was sweating a lot, had a swollen and bloody lip and [Appellant] told him "he got into something with a Philly dude." [Appellant] also told Cole that he hid a gun in an alley, and he asked Cole to go with him to see the person from Philadelphia. When Cole refused to participate, [Appellant] left and said he would be back.

[Appellant] returned to the Speakeasy fifteen (15) minutes later. He told Cole that he shot somebody and left the gun at the scene. [Appellant] asked Cole if he could use his phone because he did not have his. Cole could hear through the phone that [Appellant] called a female and asked to be picked up. The female unknown to Cole said that she was at Burger King. When Cole later heard that Royster had been shot, he called [Appellant] and asked him what he had done. [Appellant] told Cole not to discuss it on the phone.

When she received the call from [Appellant] on Cole's phone, Thornton left Burger King to pick him up at his cousin's house as he requested her to do. After picking up [Appellant], he told Thornton to drive to an apartment complex on the South Side of Harrisburg where he entered an apartment and remained inside for approximately thirty (30) minutes. They then drove to Steelton where [Appellant] gave his cousin a bag with the clothes he had been wearing and told him to burn them.

[Appellant] and Thornton then returned to [Appellant]'s grandmother's house in Mechanicsburg. When they arrived, [Appellant] told Thornton and his grandmother that he went to 1309 Berryhill Street, kicked in the door, and engaged in a "tussle" with Royster. He said that Royster had just come out of the shower, and that [Appellant] pulled the trigger as they struggled over the gun. [Appellant] left the gun at the scene and left Royster injured and "bleeding out" from a gunshot wound. When [Appellant]'s grandmother told him he had to leave, he and Thornton drove to [Appellant]'s mother's home in Harrisburg. Before parting ways with Thornton, [Appellant] told her not to speak with the police.

- 3 -

When police officers responded to the call of shots fired at 1309 Berryhill Street and made entry into the residence, they discovered blood all over the kitchen floor. Kevin Royster was found collapsed against the front door with a large shotgun wound in his right thigh. He was completely naked. He was pronounced dead at the scene.

Officers with the Harrisburg Police forensic unit discovered that the strike plates were knocked off the front door of the house, consistent with the door having been kicked in. They also noticed moisture in the bathroom as if someone had just taken a shower.

Much of the evidence adduced at trial was corroborated by historical data recovered from [Appellant]'s cell phone. The process of obtaining and analyzing this data was explained by FBI Agent William Shute.[3] By way of illustration, [Appellant]'s phone was found to be at the following locations on September 28, 2018:

a) 11:30 a.m. - 5:20 p.m.—at [Appellant]'s mother's residence;

b) 6:12 p.m. - 6:42 p.m.—at 1309 Berryhill Street, corresponding to the general time of the initial fight between [Appellant] and Royster;

c) 7:12 p.m. - 7:26 p.m.—at [Appellant]'s grandmother's home, corresponding to the trip to her house following the fight when [Appellant] retrieved the shotgun;

d) 7:46 p.m.—in the area of the alley behind 1309 Berryhill Street, corresponding to when [Appellant] hid the shotgun;

e) 7:55 p.m. - 8:40 p.m.—at Burger King, corresponding to the time when Thornton had [Appellant]'s phone and ate at Burger King alone waiting for a phone call;

f) 9:02 p.m. - 9:30 p.m.—at Hooveter Homes on the South Side of Harrisburg where [Appellant] entered an apartment without Thornton;

[3] Agent Shute was admitted as an expert in historical call detail records and geolocation data with neither examination on his credentials nor objection by [Appellant]. …

Although precise times were not testified to, [Appellant]'s phone then proceeded to Steelton where [Appellant] discarded his

clothes to be burned and then back to his grandmother's house in Mechanicsburg.

Trial Court Opinion ("TCO"), 3/24/21, at 2-6.

One day after the shooting,

a Criminal Complaint was filed against [Appellant] alleging the offenses of Murder[1] and Burglary.[2]  On September 8, 2020, [Appellant] filed a Motion to Exclude the Admission of Cellular Telephone Tower Cell Site Evidence and Google Location History Data.  On September 14, 2020, immediately prior to the commencement of trial, a hearing was held on [Appellant]'s motion.  At the conclusion of the pretrial hearing, [the court] denied [Appellant]'s motion to exclude the evidence in question.  Following a jury trial held on September 14-18, 2020, [Appellant] was convicted of both charged offenses.  On December 23, 2020, [Appellant] was sentenced to an aggregate sentence of life imprisonment[,] with a consecutive term of not less than ten (10) nor more than twenty (20) years in a state correctional institution.  On January 4, 2021, [Appellant] filed a Post-Sentence Motion which was denied on that same date.[3]  A timely Notice of Appeal was filed on January 27, 2021.

    [1] 18 Pa. C.S.[] § 2502[.]

    [2] 18 Pa. C.S.[] § 3502(a)(1)(i)[.]

TCO at 1.

Appellant filed a timely, court-ordered, Pa.R.A.P. 1925(b) statement, and the trial court issued its Rule 1925(a) opinion on March 24, 2021. Appellant now presents the following questions for our review:

    I.    Did not the lower court err in denying [Appellant]'s motion based on the standard of *Frye v. United States*, 293 F. 1013 (1923)[,] to exclude expert testimony regarding the

---

[3] In Appellant's post-sentence motion, he argued, *inter alia*, that he was entitled to a new trial based on his claim that the verdict was against the weight of the evidence with respect to his identity as the shooter.  Appellant's Post-Sentence Motion, 1/4/21, at 2 ¶ 6.

interpretation of a hybrid of cell phone tower data and geo-location data acquired from the google corporation?

II. Did not the lower court abuse its discretion by failing to grant [Appellant] a new trial on the basis that the guilty verdicts were against the weight of the evidence when the totality of the evidence with respect to establishing [his] identity as the individual who entered the decedent's residence and shot the decedent was unreliable, contradictory, and incredible?

Appellant's Brief at 5.

Appellant first asserts that the trial court erred in permitting Agent Shute to testify as an expert as to "the physical location of [Appellant]'s cell phone based on a hybrid of cell tower data analysis and Google geo-location data analysis[.]" *Id.* at 8. Appellant argues that the "scientific evidence was novel, and the Commonwealth failed to establish the general scientific acceptance of such expert conclusions under *Frye*...." *Id.*

As our Supreme Court has explained:

Appellate courts review evidentiary decisions for an abuse of discretion. *Commonwealth v. Walker*, 92 A.3d 766, 772 (2014). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Id.* at 772–73 (internal quotation marks and citations omitted).

In general, expert testimony is permitted in all trials "when it involves explanations and inferences not within the range of ordinary training[,] knowledge, intelligence and experience." *Id.* at 788. Expert testimony is governed generally by Rule 702 of the Pennsylvania Rules of Evidence.

**Rule 702. Testimony by Expert Witnesses**[]

A witness who is qualified as an expert by knowledge, skill, experience, training[,] or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. The *Frye* standard, first adopted by this Court in *Commonwealth v. Topa*, 369 A.2d 1277 (Pa. 1977), is used to determine the admissibility of novel scientific evidence, and is incorporated into Rule 702. *Grady v. Frito–Lay Inc.*, 839 A.2d 1038, 1043 (Pa. 2003). *Frye* permits novel scientific evidence to be admitted at trial "if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Walker*, 92 A.3d at 789 (citation omitted). Once it is established that the scientific evidence in question is novel, "the proponent must show that the methodology is generally accepted by scientists in the relevant field, but need not prove the conclusions are generally accepted." *Id.* at 790 (citation omitted). The burden is on the proponent of the evidence to demonstrate its admissibility. *Id.* A *Frye* hearing is not required in every instance that a party wants to introduce scientific evidence. Rather, a hearing is warranted only when the trial court "has articulable grounds to believe that an expert witness has not applied accepted scientific methodology in a conventional fashion in reaching his or her conclusions." *Id.* (citation omitted).

*Commonwealth v. Jacoby*, 170 A.3d 1065, 1090–91 (Pa. 2017) (citations reformatted).

Appellant acknowledges that this Court recently held "that scientific evidence concerning historical cell-site analysis is not novel" and, therefore, "its admissibility is not subject to the requirements of *Frye*."

*Commonwealth v. Nevels*, 203 A.3d 229, 241 (Pa. Super. 2019), *aff'd*, 235 A.3d 1101 (Pa. 2020).[4]   Thus, the scientific basis of Agent Shute's expert testimony, which included in substantial part historical cell-site analysis, was not ***entirely*** novel, as Appellant concedes that the at-issue "Google records are based on: (a) the GPS[5] device installed in the Android cell phone itself; (2) [Wi-Fi]⁶ routers accessed by the cell phone; and (3) ***historical call records based on the location of the cell tower accessed by the cell phone***."   Appellant's Brief at 11 (emphasis added).   Thus, Appellant's argument focusses on the portion of the Google location records that derive from the GPS and Wi-Fi data, which were not technologies addressed in ***Nevels***.   Appellant argues that his "research has failed to disclose any decisional authority approving expert testimony based on such a hybrid analysis" and that "***Nevels*** does not control the result in the instant matter."   ***Id.*** at 14-15.   He further contends:

---

[4] Our Supreme Court did not address the ***Frye*** issue in affirming this Court's decision in ***Nevels***.

[5] "The Global Positioning System (GPS) … is a satellite-based radionavigation system owned by the United States government and operated by the United States Space Force" that "provides critical positioning capabilities to military, civil, and commercial users around the world." https://en.wikipedia.org/wiki/Global_Positioning_System (last visited September 30, 2021).

[6] "Wi-Fi … is a family of wireless network protocols, … which are commonly used for local area networking of devices and Internet access, allowing nearby digital devices to exchange data by radio waves." https://en.wikipedia.org/wiki/Wi-Fi (last visited September 30, 2021).

Although [Agent Shute] obviously does not view testimony based on Google's geo-location data to be "novel" science, his recitation must be characterized as anecdotal and not scientific. He made only passing reference to supposed studies vouching for the accuracy of Google's data. His chief reason for accepting the accuracy of the data is that Google is a big company whose business plan hinges on the accuracy of the data.

In view of all the foregoing, this type of "hybrid" data and "hybrid" analysis is not scientifically established and must be viewed as "novel" under the *Frye* standards. The Commonwealth did not prove … that the expert's methodology has general acceptance in the relevant scientific community.

*Id.* at 15.

The trial court rejected Appellant's claim, reasoning that he failed to meet his initial burden under *Frye* to show the scientific evidence was novel because Appellant "offered no testimony at the *Frye* hearing, expert or otherwise, that established 'any legitimate dispute regarding the reliability' of Agent Shute's conclusions." TCO at 8 (quoting *Commonwealth v. Sajka*, 95 A.3d 304, 307 (Pa. Super. 2014)). As the trial court further reasoned,

Agent Shute explained that the technology he and other law enforcement officers utilize has been created and maintained in the normal course of business because they enhance those non-law enforcement entities. For example, he discussed how many years ago cell carriers had to know where phones were to assess any applicable "roaming charges." N.T.[, 9/14/20, at 28]. Not only does law enforcement now use this technology every day, but so do many people in their lives. Agent Shute pointed out the prevalence of this technology in GPS technology like Google Maps or Waze. [*Id.* at 34-36]. He provided various examples of the reliability of the technology and added that he has never seen an example of phone providing false coordinates in his twenty (20) years of experience. [*Id.* at 44]. Finally, he informed the [c]ourt that there is literature on third party testing of Google data that has confirmed its reliability, and that Google data is generally accepted as reliable in both the high tech and law enforcement

communities. [*Id.* at 33-34, 36]. Agent Shute's testimony was uncontroverted.

TCO at 9.

We agree with the trial court. Appellant's contention—that the determination of location of a smart phone through GPS and Wi-Fi technologies is novel—is thoroughly unconvincing. Appellant provided no evidence at the *Frye* hearing tending to establish that Agent Shute's expert testimony concerned novel science, or the novel use of these otherwise now-ubiquitous technologies.[7] We further reject Appellant's bald contention that Agent Shute's testimony at the *Frye* hearing was unscientific and/or anecdotal, as it is belied by the record. Agent Shute's uncontradicted testimony supports the trial court's conclusion that the at-issue science is not novel. Accordingly, we conclude that Appellant has failed to meet his burden to establish that the trial court abused its discretion in permitting Agent Shute's expert testimony under *Frye*.

Next, Appellant asserts that the jury's verdict was against the weight of the evidence.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 744 A.2d 745, 751–52 (Pa. 2000); *Commonwealth v. Brown*, 648 A.2d 1177, 1189 (Pa. 1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts

---

[7] Although we conclude that Appellant has simply failed to meet his burden below to demonstrate any controversy regarding the novelty of the at-issue science, we note that our own research has failed to uncover any state or federal court ruling suggesting that the use of a cell phone's GPS and/or Wi-Fi data to determine its prior locations is novel science.

would have arrived at a different conclusion. ***Widmer***, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" ***Id.*** at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Brown***, 648 A.2d at 1189.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. ***Id.*** Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. ***Commonwealth v. Farquharson***, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Widmer***, 744 A.2d at 753 (emphasis added).

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

> The term "discretion" imports the exercise of judgment, wisdom[,] and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice[,] or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the

- 11 -

judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Id.* (quoting *Coker v. S.M. Flickinger Co.*, 625 A.2d 1181, 1184–85 (Pa. 1993)).

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013) (citations reformatted).

Here, Appellant contends that "the evidence in its entirety was so unreliable, contradictory, and incredible that the jury's verdict was based on conjecture." Appellant's Brief at 30. Appellant supports this argument by pointing to several ostensible "conflicts and inconsistencies in the evidence," which he summarizes as follows:

(1) although the police responded immediately to the shooting, they did not observe [Appellant], who had a physically singular appearance, in the area; (2) there was no forensic evidence at the crime scene linking [Appellant] to that crime scene; (3) the only DNA on the shotgun was that of the decedent; (4) the police did not do any follow-up investigation of Kaitlyn Alston, the upstairs neighbor who had a recent dispute with the decedent; (5) Kaitlyn Alston, who was subpoenaed, inexplicably failed to show up for the trial; (6) the police failed to interview [Appellant]'s grandmother and mother to determine the veracity of Ms. Thornton's statement that [Appellant] confessed to those women; (7) the decedent has a violent character, as evidenced by his pulling a gun on Kaitlyn Alston and a knife on [Appellant]; (8) Joseph Cole's credibility is undermined by his previous conviction for perjury, by his approaching the police only after he was jailed on a parole violation detainer, and by the seemingly favorable treatment that he received in that prosecution; (9) [Appellant] displayed consciousness of innocence by immediately turning himself into the police.

*Id.* at 29-30.

Appellant's argument is unconvincing, as there was substantial evidence of his guilt, and the jury was free to make its own credibility determinations regarding the Commonwealth's witnesses. We further agree with the trial court that any deficiencies that existed in the Commonwealth's evidence were counterbalanced by

> the testimonies of Iesha Green, Lashauna Thornton[,] and Joseph Cole[, which] perfectly w[o]ve together a narrative from which the jury could very reasonably find [Appellant]'s guilt. Their testimony is remarkably supported by the historical cell data and the Burger King surveillance video. Even the minimal evidence uncovered by the police forensic unit, such as evidence that the door to 1309 Berryhill Street had been kicked in and that the bathroom appeared as if someone had just taken a shower, supports Thornton's testimony that [Appellant] told her he kicked the door in and that it appeared Royster had just come out of the shower. In this case, the guilty verdict certainly did not shock one's sense of justice and [Appellant]'s judgment of sentence should be upheld.

TCO at 7-8.

We ascertain no abuse of discretion in the trial court's denying Appellant's motion for a new trial based on his weight-of-the-evidence claim. Consequently, Appellant is also not entitled to relief on his second claim.

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/2021

- 13 -